# Exhibit C

# Consumer Information Sharing: Where the Sun Still Don't Shine

## *By Chris Jay Hoofnagle and Jennifer King[1]*

ABSTRACT ........................................................................................................................... 2

INTRODUCTION .................................................................................................................. 3

SB 27 .................................................................................................................................... 7

METHODS ............................................................................................................................ 9

RESULTS ............................................................................................................................. 10

    How Companies Complied ........................................................................................ 10
    Information Sharing Disclosures .............................................................................. 10
    The "Other" Category ................................................................................................ 11
    The Non-Responders .................................................................................................. 13
    How Long Did They Take To Respond? ..................................................................... 13
    The Role of TRUSTe ................................................................................................... 13
    Contact Information ................................................................................................... 13
    Online Versus Offline Sharing .................................................................................. 14
    Other Observations .................................................................................................... 14

CONCLUSION AND RECOMMENDATIONS .................................................................... 15

    The SB 27 Process Is Burdensome and Confusing; Information Sharing Policies Should be
    Disclosed by Default .................................................................................................. 15
    Information Sharing Language is Euphemistic, Vague, Confusing; Consumers Would
    Benefit From Clear, Unambiguous Statements of Policy .......................................... 16
    Opt-In, Opt-Out, and A Compromise ........................................................................ 17

APPENDIX 1: SB 27 DISCLOSURES ................................................................................. 18

    Walt Disney ............................................................................................................... 18
    Restoration Hardware ............................................................................................... 22

APPENDIX 2: ANN TAYLOR'S RESPONSE ..................................................................... 24

APPENDIX 3: DATACARDS FOR THREE NON-RESPONDERS ...................................... 27

    Barnes & Noble ......................................................................................................... 27
    Dow Jones ................................................................................................................... 29
    Reader's Digest .......................................................................................................... 31

APPENDIX 4: J.C. PENNEY'S RESPONSE ...................................................................... 33

[1] Respectively, Senior Staff Attorney and Research Specialist, Samuelson Law, Technology & Public Policy Clinic, University of California-Berkeley School of Law. We wish to thank Jaspreet Kaur for her assistance in organizing the data collection, and the Summer 2007 Samuelson Clinic students who made the SB 27 requests for this study. This report was made possible by a grant from the California Consumer Protection Foundation Privacy Rights Fund.  UC-Berkeley's Office for the Protection of Human Subjects determined that this research is exempt from human subjects review.

## Abstract

In late 2007, the popular social networking site Facebook.com adopted "Beacon," an application that informs Facebook users' friends about purchases made and activities on other websites.[2]  For example, if a Facebook user bought a movie ticket on Fandango.com, that user's friends would be informed of that fact through a news "feed" on Facebook.  Some users objected vigorously to the Beacon application, because their activities were reported on an opt-out basis, meaning that the user had to take affirmative action to prevent others from learning about their activities. An activism website, Moveon.org, organized a protest, calling users to action by asking, "When you buy a book or movie online…do you want that information automatically shared with the world on Facebook?"[3]  Facebook responded to these critiques by changing its policy to obtain express approval before activities on other sites would be shared with friends.

The Facebook folly demonstrates how intensely consumers reject the "sharing" of personal information for marketing purposes.  In this instance, consumers learned of Facebook's strategy because it was transparent and obvious to the individual.  But what most do not realize is that, in the absence of a specific law prohibiting information sharing, businesses are generally free to monetize their customer databases by selling, renting, or trading them to others.  In fact, the sale of customer information is a common, albeit opaque practice that, if disclosed at all, is usually mentioned in a "privacy policy." Facebook's Beacon simply made information sharing obvious to users.

Studies have shown that most consumers oppose the sale of personal information. Unfortunately, most consumers are under the misimpression that a company with a "privacy policy" is barred from selling data.  To learn more about information selling, the authors, using a California privacy law, made requests to 86 companies for a disclosure of information sharing practices.  The results show that while many companies have voluntarily adopted a policy of not sharing personal information with third parties, many still operate under an opt-out model that is inconsistent with consumer expectations, and others simply did not respond to the request.  Based on these results, the authors propose

---

[2] Louise Story & Brad Stone, *Facebook Retreats on Online Tracking*, New York Times, Nov. 30, 2007, available at http://www.nytimes.com/2007/11/30/technology/30face.html.
[3] Moveon.org, Facebook Must Respect Privacy, available at http://civ.moveon.org/facebookprivacy/?rc=fb_front (last visited Nov. 30, 2007).

several public policy approaches to bringing business practices in information sharing in line with consumer expectations.

## Introduction

A 1973 report by the Secretary of Health, Education, and Welfare's Advisory Committee on Automated Personal Data Systems recommended greater transparency in government database practices, and an ability for citizens to limit uses of personal information:

> ...*the report recommends the enactment of a Federal "Code of Fair Information Practice" for all automated personal data systems. The Code rests on five basic principles that would be given legal effect as "safeguard requirements" for automated personal data systems.*
>
> - *There must be no personal data record keeping systems whose very existence is secret.*
> - *There must be a way for an individual to find out what information about him is in a record and how it is used.*
> - *There must be a way for an individual to prevent information about him that was obtained for one purpose from being used or made available for other purposes without his consent...[4]*

This report led to the passage of the Privacy Act of 1974,[5] which sought to establish greater transparency in the federal government's collection of personal information. Three years later, the Privacy Protection Study Committee, created by the Act, recommended that comprehensive privacy rights be extended to govern relationships between individuals and all data collecting entities, even those in the private sector.[6]

---

[4] DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE, RECORDS, COMPUTERS AND THE RIGHTS OF CITIZENS: REPORT OF THE SECRETARY'S ADVISORY COMMITTEE ON AUTOMATED PERSONAL DATA SYSTEMS, Jul. 1973, available at http://aspe.hhs.gov/datacncl/1973privacy/Summary.htm.

[5] P.L. No. 93-579, 88 Stat. 1897 (Dec. 31, 1974), *codified at* 5 USC § 552a.

[6] "The Commission's findings clearly reveal an overwhelming imbalance in the record keeping relationship between an individual and an organization, and its policy recommendations aim at strengthening the ability of the individual to participate in that relationship. This can be accomplished in three ways: by prohibiting or curtailing unjustifiably intrusive information collection practices; by granting the individual basic rights, such as the right to see, copy and correct records about himself, coupled with obligations or organizations to incorporate protections for personal privacy in their routine record keeping operations; and by giving the individual control over the

However, Congress failed to implement the recommendation, and to this day there is no comprehensive statutory framework regulating private-sector information collection. Specific federal and state statutes address particular industries, such as information collection in the banking context, but many industry sectors lack information privacy regulation.

On September 24, 2003, California Governor Gray Davis signed SB 27, the "Shine the Light Law."[7]  Introduced by then Senator Liz Figueroa, the legislation intended to address a lack of transparency and control over personal data by the private-sector:

> *Secret direct marketing "profiles" of consumers are being exchanged every hour invisibly and routinely by the companies with which they do business.  Not only are consumers powerless to stop such invasions of privacy, they do not even know whether and to what extent it is taking place...*[8]

As evidence of this trade in personal information, Senator Figueroa, "...provided Committee staff with numerous examples of lists for sale on the internet, including lists of clothing consumers by height and weight, adult website customers, charitable donors to terminally ill children, and supporters of the public posting of the Ten Commandments."[9]

In crafting SB 27, Figueroa created a right to access and limit use of personal information similar to that called for by the 1974 and 1977 privacy reports.  SB 27 allows any Californian to make a request to almost any business for a disclosure of how individuals' information is used for secondary marketing purposes.  If the business

---

disclosure of records about him." PERSONAL PRIVACY IN AN INFORMATION SOCIETY: THE REPORT OF THE PRIVACY PROTECTION STUDY COMMISSION, Jul. 12, 1977, available at http://www.epic.org/privacy/ppsc1977report/c1.htm.
[7] 2003 Cal. SB 27, *codified at* Cal. Civ. Code § 1798.83-84, available at http://info.sen.ca.gov/pub/03-04/bill/sen/sb_0001-0050/sb_27_bill_20030925_chaptered.pdf.
[8] CALIFORNIA SENATE JUDICIARY COMMITTEE, SB 27 BILL ANALYSIS, Sept. 16, 2003, available at http://info.sen.ca.gov/pub/03-04/bill/sen/sb_0001-0050/sb_27_cfa_20030916_115403_sen_comm.html.
[9] *Id.*

chooses not to make such a disclosure, it must offer the individual a right to opt out of information sharing[10] with third parties for marketing purposes.

Marketing use of personal information is poorly understood by the public.  A large majority of Americans believe that laws prohibit businesses from selling personal information to others without affirmative consent.[11] According to research by Professor Joseph Turow at the Annenberg School for Communication, 59% believe, falsely, that websites with a privacy policy cannot sell personal information without consent.[12] Similarly large groups believe that restrictions protect information given to charities (47%), magazines (36%), supermarkets (36%) and banks (55%) from third party information sharing.[13] When survey interviewers asked 231 Californians about third-party information sharing, there were similar results to the Annenberg survey: 55.4% agreed with the false statement that, "If a website has a privacy policy, it means that the site cannot sell information about your address and purchase information to other companies."  Only 35.5% correctly identified this statement as false, and 9% didn't know.[14]  A question posed to a different group of 207 Californians on affiliate sharing

---

[10] "Sharing" may be euphemistic, but it is used here because there is no precise term to describe the business practice of transferring personal information to other businesses. Sometimes the data are sold, traded, or shared on a cooperative or not-for-profit basis. For purposes of this report, "sharing" means any transfer of personal information to a third party for marketing purposes.

[11] Joseph Turow, Lauren Feldman, & Kimberly Meltzer, *Open to Exploitation: American Shoppers Online and Offline*, Annenberg Public Policy Center of the University of Pennsylvania, Jun, 1, 2005, *available at* http://www.annenbergpublicpolicycenter.org/NewsDetails.aspx?myId=31.

[12] *Id.*

[13] *Id.*

[14] The 2007 Golden Bear Omnibus Survey is a random-digit telephonic survey of 1,186 English and Spanish speaking adults in California.  It was conducted by the University of California's Survey Research Center using Computer-Assisted Telephone Interviewing (CATI) to landline and wireless phones from Apr. 30, 2007-Sept. 2, 2007.  It is funded by the Survey Research Center, and these questions focusing on privacy were funded by the Samuelson Clinic.  See Joseph Turow, Deirdre K. Mulligan & Chris Jay Hoofnagle, *Research Report: Consumers Fundamentally Misunderstand the Online Advertising Marketplace* (Oct. 2007), available at http://www.law.berkeley.edu/clinics/samuelson/annenberg_samuelson_advertising-11.pdf.

yielded similar results—44.9% falsely believe that privacy policies prohibit affiliate sharing of information, and 7.2% didn't know.[15]

In reality, businesses may sell personal information unless a specific statute regulates the practice.  No privacy laws generally limit the sale of personal information by websites, by charities, magazines, or supermarkets.  Some states limit banks' sale of information to third parties, but in most cases, banks may sell the information unless the consumer affirmatively objects.[16]

Third party information sharing is strongly opposed by the public.  As Joanne McNabb, Chief of California's Office of Privacy Protection, explains, "Consumers are increasingly very unhappy with sharing of their information for marketing purposes."[17] When asked in opinion polls, large majorities of Americans indicate that they support requiring businesses to obtain affirmative consent before selling personal information to third parties.  The Pew Internet & American Life Project found that 86% support opt-in consent before companies sell personal information.[18]  Similarly, BusinessWeek found that 88% want websites to gain affirmative opt-in consent before sharing personal information with others.[19]

Strong support for limits on information sharing are also seen when individuals are asked about specific industry sectors.  For instance, a 2003 poll found that 74% of Californians would strongly favor a measure that prohibited financial companies from sharing personal financial information with any separate companies without the

---

[15] Turow, Hoofnagle, Mulligan, Good, & Grossklags, *The Federal Trade Commission and Consumer Privacy In the Coming Decade* (forthcoming 2008 in I/S - A Journal of Law and Policy for the Information Society).

[16] It is estimated that only 5% opt out from information sharing among banks.  W. A. Lee, *Opt-Out Notices Give No One a Thrill*, American Banker Magazine, Jul. 10, 2001. This may be because most consumers believe that banks need their consent before selling personal information.

[17] Louis Trager, *Cal.'s Unique, Broad New Info-Sharing Law Largely Under the Radar, Says State Privacy Chief*, Wash. Internet Daily, Oct. 7, 2005.

[18] PEW INTERNET & AMERICAN LIFE PROJECT, TRUST AND PRIVACY ONLINE: WHY AMERICANS WANT TO REWRITE THE RULES, Aug. 20, 2000, available at http://www.pewinternet.org/report_display.asp?r=19 86% support opt-in privacy policies before companies use personal information.

[19] *A Growing Threat*, BusinessWeek Magazine, Mar. 2000, available at http://www.businessweek.com/2000/00_12/b3673010.htm.

customer's permission.[20]  Perhaps the most compelling evidence for limits on third party information sharing is from North Dakota.  That State's legislature switched the default standard for sharing financial information from opt-in to opt-out.  A referendum was organized, and in June 2002, 73% rejected the legislature's dilution of privacy rights, and voted to reestablish an affirmative consent standard for banks that wished to sell personal information to others.[21]

In our study, we made SB 27 requests to 86 businesses to test implementation of the law, to better understand how businesses sell personal information, and to map the landscape of information sharing among different businesses.  The following sections of this paper explain SB 27 in greater detail, our methods for sending requests, the results of those requests, and a discussion of the results.

## SB 27

Sponsored by the California Public Interest Research Group, SB 27 was intended to promote greater transparency in direct marketing use of personal data.  SB 27 allows any Californian to contact a business and request that it disclose all the parties to whom personal information was sold in the previous year.  Alternatively, a business can respond to a SB 27 request by providing a copy of the company's privacy policy and offering the requestor a cost-free method of opting out of information sharing.  Businesses have 30 days to respond to an individual's request.  Passed in September 2003, it took effect on January 1, 2005, and thus, businesses have had almost four years to come into compliance with the law.

Several important aspects of the law must be explained: first, the law only applies to businesses with over 20 employees.

---

[20] PRIVACY RIGHTS CLEARINGHOUSE, POLL: 91% VOTER SUPPORT FOR FINANCIAL PRIVACY INITIATIVE, Feb. 10, 2003, *available at* http://www.privacyrights.org/ar/CFCsurvey.htm.

[21] NORTH DAKOTA SECRETARY OF STATE, STATEWIDE ELECTION RESULTS, Jun. 11, 2002, available at http://web.apps.state.nd.us/sec/emspublic/gp/electionresultssearch.htm?displayCode=MEASURE&cmd=Search&officeElectionNo=All+Offices+and+Measures&searchType=STATE&electionDate=06112002&showMap=N&resultType=All+Offices+and+Measures.

Second, the requestor must have an "established business relationship" with the company.  California law, borrowing language from telemarketing regulation,[22] creates a low threshold for creation of a business relationship.  In the telemarketing context, the marketing industry lobbied for a low-threshold, because federal regulations allow sales calls to individuals with an established business relationship.  In this context, however, the same low threshold makes many businesses subject to SB 27 requests.  A relationship is formed where there is a "…voluntary, two-way communication between a business and a customer, with or without an exchange of consideration, for the purpose of purchasing, renting, or leasing real or personal property…or obtaining a product or service from the business…"[23]  The law only requires a communication between individual and business, and thus, merely visiting a website to shop or compare prices would meet the threshold.

Third, financial institutions (banks, brokerage firms, and insurance companies) are exempt from SB 27.  The rationale for this exemption is that California and federal law already substantively limits these firms from sharing personal data with third parties.

Fourth, the law requires businesses to designate a mailing address, email address, or a telephone number for SB 27 requests.  It must publicize this method of contact by either telling customer service representatives about it, by publishing it on a web page with the heading "Your Privacy Rights," or by making it available at every place of business in California where the company operates.  When a SB 27 request is submitted to a designated point of contact, the company has 30 days to respond.  However, if it is submitted to a different point, the company must respond in a reasonable time period not to exceed 150 days.

Fifth, companies can designate a SB 27 contact point on a webpage titled "Your California Privacy Rights."  If a company does so, it need not respond at all to a SB 27 request sent to a different address.

---

[22] "The term established business relationship means a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a residential subscriber with or without an exchange of consideration, on the basis of an inquiry, application, purchase or transaction by the residential subscriber regarding products or services offered by such person or entity, which relationship has not been previously terminated by either party." 7 C.F.R. § 64.1200(f)(4)(1996).
[23] Cal. Civ. Code § 1798.83(e)(5).

8

These last two points are important, because practically speaking, if a consumer cannot navigate them properly, a SB 27 request may be delayed for months or totally ignored.  Furthermore, the language of the bill may give incentives to businesses not to designate a contact point, because the law implies that businesses would have up to 150 days to respond if no designation is made at all.

SB 27 was opposed by the Direct Marketing Association, and Experian, Inc., a company that sells personal information in bulk for marketing purposes.

There is only a single study of SB 27 to date.  In June 2004, Larry Ponemon of the Ponemon Institute[24] surveyed 32 for-profit organizations in California to determine how they planned to comply with SB 27.[25]  56% reported that third-party information sharing would be limited, 34% reported they would revise their customer consent process, and 13% implemented internal audit checks to ensure compliance.  Ponemon found that the cost of implementation of SB 27 was low: "Only nine companies are implementing new IT data tracking technologies to comply with the new law."[26]

Ponemon also found that SB 27 caused companies to exercise more control over personal information.  69% reported tightening internal controls over sharing of personal information with third parties.  63% tightened descriptions of "affiliates" (which may receive personal information under SB 27) and third parties (to which information flow may be restricted under SB 27).  44% reported new due diligence procedures to address sharing information with third parties.

## Methods

Students working the Samuelson Law, Technology & Public Policy Clinic during Summer 2007 each chose businesses with which they had a relationship to send SB 27 requests.  Students chose companies that were not banks, and that appeared to have over 20 employees.  As described above, SB 27 creates a complex series of conditions for contacting a business to submit a request.  Based on the law, we chose the following methods of contacting the business, in order from most preferable to least: a point of

---

[24] Author Hoofnagle is a fellow of the Ponemon Institute, but did not participate in the study described here.

[25] Larry Ponemon, *Shining the Light on Our Personal Information*, Darwin Mag., Nov. 2004 (on file with authors).

[26] *Id*.

9

contact obtained from a "Your California Privacy Rights" webpage; one obtained from calling or mailing customer service; one obtained by visiting the business; one obtained from a privacy policy page; one obtained from a webpage for legal matters; or one obtained from a general customer service webpage.

Requests were sent on June 14, 2007.  SB 27 requires a response to a request within 30 days.  In order to account for mailing delays, we waited 40 days for responses. On day 41 (July 25, 2007), we sent replies to responses that were inadequate, and sent reminder letters to companies that did not respond at all.

## Results

### *How Companies Complied*

Of the 86 requests, two companies disclosed a list of information sharing partners.  These responses from Walt Disney and Restoration Hardware are attached in Appendix 1. Twenty-two companies responded by providing a privacy policy and an opportunity for the individual to opt out.  Forty-three companies responded by providing a privacy policy or letter that indicated



Figure 1: How Companies Complied (N=86)

that the company does not sell personal information to third parties without opt-in consent.  We categorized nine responses as "other," usually because the businesses claimed that the requestor had to prove that an established business relationship existed. Finally ten companies did not respond at all as of this writing.

### *Information Sharing Disclosures*

Only two companies, Walt Disney and Restoration Hardware, disclosed their information sharing practices.

Walt Disney provided a four-page response, indicating that it shares name and address, email address, age or date of birth, number of children, age or gender of

children, occupation, telephone number, and the kind of product purchased with thirty-two entities.  The third parties identified by Walt Disney included several closely-affiliated companies, such as ABC Cable Networks Group, ABCNews, American Broadcasting Companies, Inc., Disney Shopping, Disneyland Resort, and Disney Online. It also included other companies, such as American Honda Motor Corp., Almay, Angelsoft, Baby Einstein Company, Buena Vista Magazines, Buena Vista Television, and Dannon.

Restoration Hardware shares customer names, addresses, and items purchased with fewer entities, but the privacy impact of the information sharing is enormous.  This is because Restoration Hardware's information sharing partners covers the entire range of large cooperative database companies--Next Action, Ibehavior, Abacus, Experian Z24, and the Prefer Network.  Cooperative databases allow retailers to pool their customer lists in order to find new customers.  Accordingly, when a company enters into a cooperative database relationship, hundreds and even thousands of other businesses have access to the company's customer list.

### The "Other" Category

We placed nine companies in the "other" category.

Disputes concerning whether an established business relationship existed between the requestor and company accounted for four of the companies in the other category.  In these cases, the company refused to comply with the law, claiming either that no established business relationship existed, or that the requestor was under an affirmative duty to prove that one existed. In each of these cases, we responded to the company, reasserting that the requestor did have a customer relationship, and that the law did not require account information or other proof that such a relationship existed.  Despite these assurances and explanation, Rescue Rooter, Fast Cupid, Lexis Nexis, and Verizon never responded to the second letter.

Two companies, Macy's and the Huggies Baby Network (Kimberly-Clark) responded with a letter explaining that they needed more time to respond, but as of December 2007, no further communication has been received.

Another company, the New York Times, was categorized as "other" because it had different practices online and off.  In the case of online users, the company does not

11

sell personal information to third parties for marketing purposes.  But for offline print subscribers, the company does sell its customer list and offers the ability to opt out.[27]

One company, Ann Taylor, responded with a privacy policy and opportunity to opt out that does not appear to comply with the law.  The start of one paragraph claims that the company does not sell data to third parties: "To respect your privacy, Ann Taylor will not sell or rent the personal information you provide to us online to any third party." The same paragraph later states, "Ann Taylor may share information that our clients provide with specially chosen marketing partners."[28]  It is unclear whether this second statement applies to information collected online, offline, or both, but SB 27 is clear: an opt-out right must be offered to all information sharing.



One company, Midas, responded by saying that if third party information sharing was occurring, it would be performed by the franchise, not the parent company, thus suggesting that the student write to the local Midas shop.

Although not categorized as "other," several companies, including Amazon.com,[29] U-Haul, and Land's End, claimed that no established business relationship existed, but nevertheless complied with the request.  Amazon.com and U-

---

[27] The datacard provided here is one of 60,000 available online from Direct Magazine. *See* THE NEW YORK TIMES, DIRECT MAG LIST FINDER, available at http://listfinder.directmag.com/market?page=research/datacard&id=162122&aId=962.
[28] Attached as Appendix 2.
[29] Amazon.com was also of the incorrect legal opinion that it did not have to comply with the California law because the company has no physical presence in the State.

Haul had policies specifying that they did not share personal information; Land's End offered the ability to opt out of information sharing.

### The Non-Responders

Ten companies didn't respond to our initial or follow up SB 27 requests.  Those companies were AT&T/Cingular, Barnes and Noble, Circuit City Stores, Costco, Dell Inc., Dow Jones & Company, Hilton Hotels Corporation, Readers Digest Association, Safeway Inc. and Whole Foods Market.  In searching popular direct marketing websites, we were able to determine that three of these companies do advertise that they sell customer information: Barnes and Noble, Dow Jones & Company, and Readers Digest Association.  The solicitations appear in Appendix 3.

### How Long Did They Take To Respond?

We were pleased to find that on average, companies that responded did so in 32.6 days (median=30.5).  Several companies responded with 7 days. Those companies were: Last.fm, Snapfish, Best Western, Blockbuster, Red Envelope, Super Media Store.com, Banana Republic, Best Buy, and J.C. Penney.

### The Role of TRUSTe

One student noticed that three of the companies she queried, the New York Times, Flickr (Yahoo), and Shutterfly, that did not respond within 40 days of the initial request had TRUSTe privacy seals on their websites.  TRUSTe is a non-profit organization that certifies privacy policies and monitors practices of companies.  Companies that apply for TRUSTe certification must give customers an ability to opt out from information sharing with third parties.  Once this certification is in place, TRUSTe will mediate conflicts on privacy matters.

Since these three companies did not respond, the student wrote to TRUSTe to complain.  TRUSTe opened case numbers for all three, and within a short time, all three companies responded.

### Contact Information

SB 27 requires companies to follow one of several procedures to inform individuals of their rights to request an information sharing disclosure.  We found that

only 10 of the 86 companies in the study posted this information marked with a "Your California Privacy Rights" label on their website.

### *Online Versus Offline Sharing*

Recall that the New York Times responded by specifying that the company sold information about its print subscribers, but did not sell data collected online.  SB 27 is about information sharing generally, online and off.  But in some cases, it is not clear whether a response pertains just to the company's online practices.  Many responses refer to online activities without mentioning information sharing that may occur at brick and mortar stores.

### *Other Observations*

JetBlue responded in 28 days with an assurance that it did not sell data for marketing purposes.  It also claimed that it was statutorily barred from selling such data under the "Federal Passenger Privacy Act." To our knowledge, such a law does not exist.

Privacy laws such as SB 27 are generally conceived of as a tool for consumers to expose business practices.  But even companies that sell their consumer databases to third parties can write a response that places the company in a good light.  One such company was J.C. Penney's, which responded within the week of the request with a clearly-written letter explaining their practices.  This form of compliance is far superior to the approach taken by many companies—simply mailing the privacy policy to the requestor.

Privacy policies are so confusing that in some cases, our students did not fully understand the responses.  For instance, if a company offered an ability to opt out of a newsletter, some students mistook this to mean that the company sold data to third parties, and was offering an opt out of information sharing.  This is another reason why responses like J.C. Penney's (included as Appendix 4) were more effective—they clearly stated company practices without simply repeating the confusing and strained language of a privacy policy.

Ann Taylor, unfortunately, serves here as another example of the poor practice of simply responding to requests with a copy of the privacy policy.  According to the privacy policy, the company does offer an ability to opt out of Ann Taylor emails.

However, a careful reader will notice that no mention is made whether this also restrains information sharing with third parties.

## Conclusion and Recommendations

We were pleased to find that most companies responded to SB 27 requests, and that the average time for a response was 32.6 days.  Furthermore, half of the companies we queried stated that they did not share personal information with third parties for marketing purposes.  The other companies that we queried, however, demonstrated policies that contravene consumers' expectations at best.  Several interventions could remedy these problems.

### *The SB 27 Process Is Burdensome and Confusing; Information Sharing Policies Should be Disclosed by Default*

Fundamentally, the SB 27 request process is burdensome to all parties involved, and should be revamped to serve the goal of the legislation—to shine a light on third party information sharing.  Rather than having consumers navigate the process of picking the right SB 27 contact information for a business (which may be ignored if it is incorrect), haggling over whether a customer relationship exists, and sending a request, it would make sense to require online businesses to post their third party information sharing policies as part of their overall privacy policy.

California law already requires certain disclosures in privacy policies regarding third party information sharing[30]—simply expanding this requirement to include a full SB 27 disclosure could eliminate the burden of complying with the labyrinthine request process for both consumers and businesses.  Brick and mortar stores that choose to share information with third parties could inform customers of this fact in person by posting a short notice at the cash register.

Accordingly, we recommend that the State legislature amend the California Online Privacy Protection Act of 2003 to incorporate the duty to disclose third party information sharing arrangements.

---

[30] See Cal. Civ. Code § 22575.

### *Information Sharing Language is Euphemistic, Vague, Confusing; Consumers Would Benefit From Clear, Unambiguous Statements of Policy*

Information sharing would be elucidated more fully if privacy policies used standard, non-euphemistic terms to describe their information sharing practices. Currently, many SB 27 statements and privacy policies use confusing terms to refer to the status of an information sharing partner.

For purposes of the law, the critical issue is whether an information sharing partner is an affiliate or a non-affiliate.  However, companies use terms such as "sister company," a "family" company, "specially chosen," and "trusted partner" to describe information sharing relationships.  These euphemistic terms are vague and misleading.  For instance, how do "family" and "trusted" companies differ?  What objective criteria make an information-sharing partner "trusted," and if this partner violates that trust, who is responsible?[31]

More importantly, many companies' responses were so confusing that it was difficult to tell whether the company shared personal information with others.  Instead of giving consumers a clear, binary "we share" or "we do not share" representation, privacy policies allow vague or contradictory statements.  Recall Ann Taylor's privacy policy, which promises not to sell data collected online, but later states that information can be shared with "specially chosen marketing partners."

Consumers would benefit from clarity on both of these issues.  Accordingly, we recommend that the State specify that "affiliate" or "non-affiliate" be used to describe the relationship between companies, and that a clear, unambiguous statement be made on companies' information sharing policies.

---

[31] *See e.g.* IOWA DEPARTMENT OF JUSTICE, A.G. ASKS COURT TO ORDER LIST BROKER TO RESPOND TO TELEMARKETING FRAUD PROBE, Mar. 3, 2005, available at http://www.state.ia.us/government/ag/protecting_consumers/2005_news/3_3_ag.html (discussing sale of personal information to fraudsters using list provider Walter Karl); NEW YORK ATTORNEY GENERAL, INVESTIGATION REVEALS MASSIVE PRIVACY BREACH, Mar. 13, 2006, available at http://www.oag.state.ny.us/press/2006/mar/mar13a_06.html (discussing sale of personal information to Datran Media).

*Opt-In, Opt-Out, and A Compromise*

SB 27 recognizes that opt-out is the legal standard for control over information in most contexts in which a business wants to share customer lists with others. In light of consumer expectations and desires, this recognition should be revisited. Recall that related research performed by the Samuelson Clinic and by the Annenberg School for Communication indicates that most consumers think privacy policies mean that personal information is protected against secondary use. And when consumers are asked directly whether they prefer opt-in or opt-out, opt-in invariably trumps.

Nevertheless, there remains a gulf between expectations and legal standards for sharing of personal information. SB 27, by shining light on information sharing, and by establishing a right to opt out, attempted to address that gulf. A reasonable middle ground between opt-in and opt-out may still be opt-out. For instance, the National Do-Not-Call Telemarketing Registry (NDNCR) is a well-designed opt-out approach. The NDNCR gives individuals an opportunity to opt out from telemarketing simply and quickly, and its success is clearly documented—132 million numbers have been enrolled, and over 90% of Americans have reported receiving fewer telemarketing calls.[32] 25% report receiving no sales calls.[33]

The NDNCR shows that if given simple and convenient tools to limit unwanted marketing, consumers will use them. Accordingly, we recommend that the State legislature consider creating a centralized method of opting out of information sharing. States were the progenitors of telemarketing do-not-call lists; it is time that states experiment with other tools that give individuals more control over use of personal information.

---

[32] FEDERAL TRADE COMMISSION, ANNUAL REPORT TO CONGRESS FOR FY 2006 TO THE DO NOT CALL IMPLEMENTATION ACT OF THE NATIONAL DO NOT CALL REGISTRY, Apr. 5, 2007, available at http://www.ftc.gov/opa/2007/04/fyi07232.shtm.
[33] *Id*. at Fn. 7.

17

## Appendix 1: SB 27 Disclosures

### *Walt Disney*



June 21, 2007



We're pleased to provide the information below.

At our company we take great pride in the relationship of trust we have built with our guests over many years and are dedicated to protecting guest privacy and to proper handling of any personal information we obtain. Should you wish to learn more about our privacy policy, you can access it by clicking on the privacy policy links on our sites' homepages.

Thank you.

••••••••••••••••••••••••••••••••••••••••••••••••••••••

Buena Vista Internet Group
California Civil Code § 1798.83 Statement

In accordance with California Civil Code § 1798.83, Buena Vista Internet Group is providing the following information set forth in this statement for the 2006 calendar year.

Categories (disclosed in accordance with California Civil Code § 1798.83 (a)(1)):

Name and address
Electronic mail address
Age or date of birth
Number of children
The age or gender of children
Occupation
Telephone number
The kind of product the customer purchased, leased, or rented.

Third Parties (disclosed in accordance with California Civil Code § 1798.83 (a)(2)):

ABC Cable Networks Group
3800 W. Alameda Ave.
Burbank, CA 91505
Cable television services (e.g. Disney Channel)

ABCNews
7 West 66th Street
New York, NY 10023
Television news broadcast services

American Broadcasting Companies, Inc.
77 West 66th St
New York, NY 10023
Television broadcast services

The Walt Disney Internet Group - 500 South Buena Vista Street, Burbank, California 91521-7663

18

American Honda Motor Corporation
3350 Enterprise Avenue
Weston, FL 33331
Automobile manufacturer (e.g. Honda CRV)

Almay Corporate Headquarters
237 Park Ave
New York, NY  10017
Cosmetics manufacturer

Angelsoft
30 East 23rd Street Floor 10
New York, NY 10010
Consumer packaged products (e.g Angelsoft toilet tissue)

The Baby Einstein Company, L.L.C.
500 South Buena Vista St.
Burbank, CA 91521
Baby Einstein consumer products

Blitz Agency
405 S. Beverly Drive, 3rd Floor
Beverly Hills, CA 90212
Marketing services

Buena Vista Magazines, Inc.
47 Pleasant St.
Northampton, MA 01060
Consumer magazines (e.g Disney Adventures Magazine)

Buena Vista Home Entertainment, Inc.
350 South Buena Vista Street
Burbank, CA 91521-6655
DVDı s and videocassettes

Buena Vista Television
500 S. Buena Vista
Burbank, CA 91521-0224
Television production services (e.g. Live with Regis and Kelly)

Dannon Consumer Response Center
P.O. Box 90296
Allentown, PA 18109-0296
Packaged consumer food (eg. Dannon yogurt)

Disney Shopping, Inc.
500 S. Buena Vista Street
Burbank, CA 91521
DisneyShopping.com

DISNEYLAND Resort
700 W. Ball Road
Anaheim          CA 92802
Hotel accommodations at Disneyland

Disney Online
500 S. Buena Vista St.
Burbank,CA 91521

The Walt Disney Internet Group - 500 South Buena Vista Street, Burbank, California 91521-7663

Disney Rewards, LLC
1020 W Ball Rd
Anaheim CA 82802
Disney consumer credit card services

Disney Vacation Development, Inc.
200 Celebration Place
Celebration, FL 34747

ePrize Inc.
1201 West Fifth Street
Suite T330
Los Angeles, CA 90017
Interactive marketing services

E S Drake
350 North 9th Street Suite 404
Boise, ID 83702
Integrated advertising including marketing and interactive web design

Canon, U.S.A., Inc.
One Canon Plaza Lake Success, NY
11042-1198
Electionics (e.g. copiers)

ESPN Magazine, LLC
19 E. 34th St.
New York, NY 10016
Consumer magazine

ESPN/Starwave Partners
19 E. 34th St.
New York, NY 10016
EPSN.com

Feld Entertainment, Inc.
8607 Westwood Center Drive
Vienna, VA 22182
Phone: (703) 448 - 4000
Live entertainment productions (e.g. Disney on Ice)

George Weston Bakeries
P.O. Box 535
Totowa, NJ 07511; 800-356-3314
Bakery (e.g. Entenmanns products)

Harpercollins Publishers
9 Kendall, Marlton
NJ 08053
Book Publishing

IgoUgo
139 Centre Street, 9th Floor
New York, NY 10013
Phone: (212) 372-5117
Fax: (682) 606-7117
Igougo.com

The Walt Disney Internet Group - 500 South Buena Vista Street, Burbank, California 91521-7663

20

Integrated Marketing Technology
50 Osgood Place
Suite 330
San Francisco, CA 94133
Marketing services

Lucid Marketing
2 N. Main Street
PO Box 389
Allentown, NJ 08501
Marketing services

Mattel Sales Corporation
2310 Ridge Road
Rockwall, TX 75087
Toy manufacturer (e.g. Polly Pockets)

Netflix Incorporated
4155 Willow Lake Boulevard
Memphis, TN 38118
Netflix.com

SunHealth Solutions
25 Second Avenue South
Naples, FL 34102
1-888-403-0605
Health food products (e.g. Sun Signals)

Walt Disney World Co.
1375  Buena Vista Drive
Lake Buena Vista FL 32830
Resort and theme park services

*Restoration Hardware*

15 Koch Road
Corte Madera, California 94925
T 415.924.1005  F 415.927.9133
RestorationHardware.com

RESTORATION HARDWARE



July 11, 2007

Thank you for your recent inquiry regarding how your personal information has been shared by Restoration Hardware. Your name, address and what you purchased from Restoration Hardware were shared with the following 3rd parties for Direct Marketing purposes:

**Next Action**
10155 Westmoor Dr
Westminster, CO  80021

**Ibehavior**
550 Ann Street
Plymouth, MI 48170

**Abacus**
200 Taylor Meadow Chase
Roswell, GA 30076

**Z24**
370 Interlocken Blvd, Suite 110
Broomfield, CO  80021

**Prefer Network**
620 Elm Terrace
Riverton, NJ 08077

**Wiland**
2950 Colorful Avenue, Suite 100
Longmont, CO  80504

**Mokrynski Direct**
401 Hackensack Ave
Hackensack, NJ  07601

22

15 Koch Road
Corte Madera, California 94925
T 415.924.1005  F 415.927.9133
RestorationHardware.com

RESTORATION HARDWARE

Enclosed you will find a copy of our privacy statement which includes an opt-out option. If you would like to opt-out, you can either go to www.restorationhardware.com and click on the privacy policy link at the bottom of the page and opt-out via the email link in the Last Updated: September 18, 2006 section or call toll-free: 1-800-910-9836.

If I may be of any other assistance, please contact me.

Sincerely,

Ian Sears
Chief Marketing Officer
Restoration Hardware
15 Koch Rd. Suite J
Corte Madera, CA 94925

23

## Appendix 2: Ann Taylor's Response

ANN TAYLOR

August 9, 2007



We received your letter dated July24, 2007 in regards to the information we collect from our clients. The details you are requesting are made public via ANNTAYLOR.com and AnnTaylorLOFT.com under the Privacy and Security tab. For your convenience, we have included the scripting to that section below.

Ann Taylor values the trust you have placed in us. As part of our relationship, we recognize and respect your privacy. That is why Ann Taylor is committed to protecting your privacy and using the information you share with us responsibly.

Our Privacy & Security Statement describes the information we collect about you, as well as why and how we use it. We also explain the choices you can make about how we collect and use your information.

We collect information from you that you provide when you login, join our mailing list, register with us, place an order, or participate in a contest, promotion or survey. Categories of information collected include your name, e-mail address, postal address, phone number and credit card number. In addition, we may maintain a record of your purchases from ANNTAYLOR.COM and from our stores. We may also acquire names and mailing addresses for select mailings from third parties. On occasion, we may combine information you provide with other demographic information available to us.

When you make a purchase from ANNTAYLOR.COM, we use your information to process your order and to answer your questions about the status of your order. We may use the information to provide you with periodic e-mails and mailings about Ann Taylor merchandise, services and promotions. We may also send you e-mails to help us learn more about your shopping preferences. In addition, we use information about your product interests and purchases to help us improve our online store and your shopping experience. If you request a catalog from us, if you register with us, or if you purchase from us online or over the phone, you have the option to request marketing materials from us, and we may send you notices about our merchandise, services and promotions through mail.

To respect your privacy, Ann Taylor will not sell or rent the personal information you provide to us online to any third party. Ann Taylor only shares information about our clients with affiliated companies and reputable third parties to provide better service to you. These services may include maintaining and managing customer information; providing customer services; taking and fulfilling orders; conducting Ann Taylor promotions and surveys; and communicating effectively with our clients. We do not authorize those third parties to make any other use of your information or to send you unsolicited e-mail. In addition, Ann Taylor may share information that our clients provide with specially chosen marketing partners. We also may share aggregated statistical or demographic information about you with third party companies in a manner that does not reveal your personal identity.

When Ann Taylor conducts contests, sweepstakes, promotions, and surveys, or joins with other companies to do so, clients who choose to participate may be asked to provide personal information. Ann Taylor and the other participating companies may use this information for such purposes as notifying winners and fulfilling promotional obligations, and may also cross reference customer databases to identify common customers. Information from these activities may be used to explore future promotional opportunities or fulfill contractual obligations. Even if you have chosen not to receive e-mail or postal mail from Ann Taylor prior to your participation in a contest, sweepstakes, promotion or survey, you may still receive information from Ann Taylor in connection with such activity if you register for or participate in it. You may choose not to participate in contests, sweepstakes, promotions or surveys if you do not wish to receive information from

100 East Campus View Boulevard  Suite 250  Columbus, Ohio  43235   Tel 800.677.6788  Fax 614.438.4089

# ANN TAYLOR

Ann Taylor or share your information with Ann Taylor and the other companies sponsoring such activities.

If you are visiting ANNTAYLOR.COM through a link from another website or search engine, information about your visit to ANNTAYLOR.COM may be collected by the provider of the other website or search engine. We encourage you to review the privacy policies of these other websites or search engines. You may avoid disclosing your information to these other websites or search engines by entering ANNTAYLOR.COM directly into the address field of your Internet browser.

If at any time you want to change or review the information you have provided, simply sign on to ANNTAYLOR.COM and click on "My Account" on the navigation bar. You will then be able to change any information stored in your account. Be sure to click "Save" when you complete your changes.

You can also change or access this information by calling 1-800-DIAL-ANN, or by sending an e-mail to clientservices@ANNTAYLOR.COM. Please be sure to include or have ready your full name, address, phone number and e-mail address.

If you would prefer not to receive our e-mails and/or mailings-just let us know. You may submit your request to unsubscribe directly at ANNTAYLOR.COM. To access this feature, click here. In addition, if you have received an e-mail from Ann Taylor, you may also reply with the word "unsubscribe" in the subject line. You may also contact us as follows.

By Email:   clientservices@ANNTAYLOR.COM
By Phone: 1 800 DIAL ANN
Fax         1-866-2FAX-ANN
By Mail:    ANN TAYLOR CLIENT SERVICES
             100 ANN TAYLOR DRIVE
             P O BOX 571650
             TAYLORSVILLE, UT 84157-1650

Please include your name and address as it appears on the e-mail or postal mail you received from us and indicate "Do not contact me by (e-mail) or (mail)."

Your request may take up to 10 business days to process, and you may receive e-mail or postal mail in the meantime. Your removal request, along with your name and address will be stored in a "do not contact" file to ensure that we can honor your request. Please note that if you make subsequent purchases from our website, we will confirm your order by e-mail, and we may need to contact you by phone, e-mail, or postal mail with other questions regarding your order.

Cookies are bits of information that are automatically stored on your computer's hard drive to recognize your preferences in order to make shopping easier. ANNTAYLOR.COM uses cookies to help us personalize your shopping experience and keep track of your order as you shop in our online store. Your cookie also allows us to recognize you when you return to our site and provides you with access to your account information. Cookies do not contain any personally identifiable information, such as your name, address or any financial information on your computer.

Ann Taylor may use reputable third parties to provide services to us, such as to help us measure the effectiveness of our advertising and how visitors use our site, and these third parties may also use cookies on your computer. ANNTAYLOR.COM respects your right to choose whether to be included in the services that these third parties provide. If you would like to opt-out of these services, please click here.

You can refuse cookies by turning them off in your Internet browser. In order to disable cookies, please consult your browser's help section for instructions. If you turn off cookies, however, you will not be able to purchase from our website, as we will not be able to track your online order. You may still place an order by calling us at 1-800-DIAL-ANN.

The safety of your credit card information is important to us, and Ann Taylor has taken measures to protect the security of your online order information.

100 East Campus View Boulevard  Suite 250  Columbus, Ohio  43235   Tel 800.677.6788  Fax 614.438.4089

# ANN TAYLOR

Ann Taylor uses Secure Sockets Layer (SSL) technology to keep your online order information safe. SSL technology encrypts your credit card number, order information and personal information before it is transmitted to protect it from being decoded by anyone other than Ann Taylor. Our site also displays the VeriSign Secure Site Seal, which indicates that the site has been authenticated by VeriSign and that confidential transactions with the site are secured by SSL encryption.

Once you enter the checkout page, your computer will begin communicating with our server in secure mode. You can determine the security of your connection by looking at the bottom of your internet browser window after you have accessed our website-SSL technology is active if there is a solid key or a closed lock. You can also double-check by looking at the URL line of your browser. When accessing a secure server, the first characters of the site address will change from "http" to "https."

Some versions of browsers and some firewalls don't permit communication through secure servers like the ones we use to process orders at ANNTAYLOR.COM. If you cannot access the secure server for any reason, you can place your order by calling 1-800-DIAL-ANN.

While we implement the above and other security measures to protect your information, please note that no data transmitted over the Internet or any other public network can be guaranteed to be 100% secure.

The ANNTAYLOR.COM website may include links to other websites that are not under our control. These other websites have their own policies regarding privacy that you should review. Ann Taylor has no responsibility for these linked websites.

Ann Taylor is concerned about the privacy of young children and we do not knowingly collect any personal information from a child under 13 years of age. Ann Taylor does not sell products for purchase by children.

Ann Taylor may update the Privacy & Security Statement from time to time. When we make changes, we will post them on our website. You may wish to check this section from time to time, because by visiting our website, you agree to accept any such changes to these policies. Except as otherwise mentioned herein, this Privacy & Security Statement only addresses the use and disclosure of information we collect from you on our website.

If you have any questions about our Privacy & Security Statement, please contact us.

By Email:   clientservices@ANNTAYLOR.COM
By Phone: 1 800 DIAL ANN
Fax          1-866-2FAX-ANN
By Mail:    ANN TAYLOR CLIENT SERVICES
               100 ANN TAYLOR DRIVE
               P.O. BOX 571650
               TAYLORSVILLE, UT 84157-1650

**We hope this information has been beneficial.**

Sincerely,

Rick Lee
Assistant Manager
Ann Taylor Corporate Client Contact

100 East Campus View Boulevard  Suite 250  Columbus, Ohio  43235   Tel 800.677.6788  Fax 614.438.4089

## Appendix 3: Datacards for Three Non-Responders

### *Barnes & Noble*





Maximum Inserts: 5

**Usage:**

First Street, JC Penny, Net2Phone, Nextten, Omaha Steaks, Oreck, Red Envelope, Sharper Image, Vonage, Bose, DISH Network, ShoeTrader.com, Nutri System, IDT

Get More Information    Get a Price Quote

© 2007 Penton Media Inc.                        Home | Penton Media Inc | Contact Us | For Advertisers | For Search Partners | Privacy Policy | Terms of Use

powered by NextMark

*Dow Jones*



- Publishing

Additional Selections

- Children By Age
- Contributors
- Cooking
- Fitness/Exercise
- Gardening
- Golf
- Pet Owners
- Seniors (Age 55+)

RELATED LISTS

1. J. Peterman Catalog
2. The Wall Street Journal
3. Money
4. Forbes
5. Conde Nast Lifestyles - Investors
6. Fortune
7. Kiplinger's Consumer Enhanced Masterfile
8. Kiplinger's Personal Finance
9. Hammacher Schlemmer Mail Order Buyers
10. Williams-Sonoma - The Universe File

Get More Information | Get a Price Quote

© 2007 Penton Media Inc.

Home | Penton Media Inc. | Contact Us | For Advertisers | For Search Partners | Privacy Policy | Terms of Use

powered by NextMark

*Reader's Digest*



**Reader's Digest**

Reader's Digest provides an enriching breadth of editorial that meets subscribers' insatiable appetite for service journalism, current events, humor, and adventure that stem from The Digest's core affinities-health, home, family, finance, and faith.

Get More Information     Get a Price Quote

**SEGMENTS**

| | | |
|---|---|---|
| 5,241,710 | Universe / Base Rate | $95.00/M |
| 2,759,150 | Active Female Subscribers | + $8.00/M |
| 2,027,530 | Active Male Subscribers | + $8.00/M |
| 1,307,730 | 3 Month Hotline | + $10.00/M |
| 441,700 | 1 Month Hotline | + $15.00/M |
| 33,370 | 1 Month Change of Address | + $15.00/M |
| 2,242,860 | Sweeps Sold Subscribers | + $15.00/M |
| 1,451,720 | Gift Givers for Nonpub. Mailers | + $10.00/M |
| 950,000 | 24 Month Expires | $75.00/M |
| 880,000 | 24 Month Paid Cancels | $75.00/M |
| | Catalog Rate | $80.00/M |
| | Fundraiser Rate | $75.00/M |
| | Non-Profit Rate | $80.00/M |
| | (enhancements are available, please inquire) | |

**DESCRIPTION**

Beneath the fun and excitement that fills Reader's Digest each month, is serious material for an audience of serious readers. Basic to the magazine is a steady focus on the power of the individual. Stories originate from the grit of human experience — the tough, the tender, the funny. At the forefront of major issues of medicine, health, environment, human rights, and more, Reader's Digest delivers a package of humor, drama, and helpful information that guides readers in every aspect of their lives with powerful principles encompassing right vs. wrong, eternal values, and clarification of issues that often confuse.

An Audience of Many Interests as Detailed by Editorial Categories:

- 25% Cultural/Humanities
- 21% Health
- 14% National Affairs
- 13% General Interest
- All others include Business, Home, Travel, Sports, International

**PROFILE**

| | |
|---|---|
| NEXTMARK ID: | 57241 |
| POPULARITY: | ===== 100 |
| MARKET: | CONSUMER |
| MEDIUM: | mail |
| SOURCE: | 78% DTP, 22% AGENTS, 8% INTERNET |
| GEO: | DOMESTIC (US) |
| GENDER: | 49% FEMALE 44% MALE |
| INCOME: | 45,000 |
| SPENDING: | $24.00 |

**SELECTS**

| | |
|---|---|
| 1 MONTH HOTLINE | $15.00/M |
| 3 MONTH HOTLINE | $10.00/M |
| 3RD PARTY BLOW-IN | $15.00/M |
| 6 MONTH HOTLINE | $8.00/M |
| CHANGE OF ADDRESS | $15.00/M |
| DMS | $8.00/M |
| DTP | $8.00/M |
| ENHANCEMENTS | $12.00/M |
| GENDER/SEX | $8.00/M |
| PAID | $8.00/M |
| RENEWALS | $8.00/M |
| SCF | $8.00/M |
| STATE | $8.00/M |
| ZIP | $8.00/M |

**ADDRESSING**

| | |
|---|---|
| KEY CODING | $3.00/M |
| CARTRIDGE | $25.00/F |
| DISKETTE | $50.00/F |
| EMAIL | $55.00/F |
| FTP | $70.00/F |
| TAPE CONVERSION FEE | $25.00/F |

31



An Audience Embracing the High Tech Era:

- 50%+ own a PC
- 40%+ are online
- $2,000 average amount spent on home PC systems
- 20% plan to purchase a computer in next 12 months

Reader's Digest subscribers represent one of the largest slices of Americana that is direct-sold, inquisitive, literary, seeking to improve their own selves, and concerned about the short and long term future of life on earth. This well-rounded audience is a perfect prospecting tool for many offers including: Computers/Consumer Software, Charitable Causes, Health, Children's/Family, Housewares, Gifts, Food, Women's Casual Apparel, Gardening, and more.

**RELATED LISTS**

1. The Lifestyle Selector From Equifax
2. BMG Music Service - Sound & Spirit (Christian Music Club)
3. Paralyzed Veterans Of America Premium Donor Masterfile
4. AOK HEALTH CAUSE CONTRIBUTORS
5. TIME
6. FATHER FLANAGAN'S GIRLS AND BOYS TOWN DONORS
7. ANGELS ON EARTH ACTIVE SUBSCRIBERS
8. CYSTIC FIBROSIS FOUNDATION DIRECT MAIL DONOR MASTERFILE

**Get More Information**    **Get a Price Quote**

© 2007 Penton Media Inc.

Home | Penton Media Inc | Contact Us | For Advertisers | For Search Partners | Privacy Policy | Terms of Use

powered by NextMark

## Appendix 4: J.C. Penney's Response



June 20, 2007

I AM GLAD YOU ASKED:

JCPenney occasionally shares the names and addresses of our customers with responsible companies outside the JCPenney family. We choose companies that we feel offer products or services that might be of interest to you. We require that these outside companies use the information only to make the offers we authorize and that they maintain the confidentiality of the information. We also have procedures intended to ensure that your personal information is handled in a safe, secure and responsible manner.

If you would prefer that we not share your name and address with these outside companies please write to us at the following address:

JCPenney Company
PO Box 10001
Dallas, Texas 75301-7311
Attention: Corporate Customer Relations

You may also call us at 1-800-204-3334, or e-mail us at privacyjcpenneyeservices.com. A copy of our Privacy Policy is posted on our web site at JCPenney.com. The policy may be accessed from there by clicking on Customer Service and Privacy Policy.

Thank you for contacting us. We at JCPenney value you as a customer and look forward to serving your future shopping needs.

Corporate Customer Relations

**J. C. Penney Company, Inc.**
P.O. Box 10001, Dallas, TX 75301-0001
6501 Legacy Drive, Plano, TX 75024-3698

33