# Exhibit H

## Commissioner Pamela Jones Harbour

## Remarks Before FTC Exploring Privacy Roundtable
## Washington, D.C
## December 7, 2009

### **Introduction**

Welcome back from lunch, and thank you for the opportunity to offer a few thoughts to begin the afternoon.

As many of you know, my time at the FTC is coming to a close. Throughout my term, privacy issues have been among my highest priorities. I am encouraged that the Commission, through this roundtable series, is now engaging stakeholders in a holistic discussion of privacy. The 2007 Ehavioral Town Hall initiated an important conversation by focusing attention on behavioral targeting. But even more importantly, the Town Hall raised the key questions that have since triggered a return to first principles, as the FTC re-evaluates the frameworks it uses to analyze privacy.

### **More Data = Need for Greater Attention to Privacy**

As part of its promise of change, the current Administration has embraced technology and innovation, along with a new era of openness. But real change cannot just be aspirational. It requires concrete action. And unfortunately, with respect to privacy, I believe action has not been a high enough priority to date. I certainly do not intend to criticize Representative Boucher's efforts to craft legislative guidance on behavioral advertising. But as I have previously stated, the United

States needs comprehensive privacy legislation. If we continue the piecemeal approach to privacy in this country, we merely push aside the underlying issues.

The privacy debate goes far beyond online advertising, because behavioral targeting represents just one aspect of a multifaceted privacy conundrum. Data collection, aggregation, and use (as well as reuse, sale and resale) are driving the creation of on- and offline "digital dossiers." Capturing data reflecting individual interests and habits is an enormous and growing business – evidence that consumer privacy is under siege.

Online advertising is an enormous source of information collected about consumers, and serves as an important lens to focus our understanding of data collection and use. Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis – and profit.

Collection of consumer data is by no means new. Census information, credit reports, and Nielsen data have existed for decades. The Internet, however, enables the creation of vastly larger quantities of consumer data. These data are collected every time we send email, update status on a social networking site, read a news article, run a search, or make an online purchase.

Of course, these technologies have the potential to offer valuable benefits to consumers. The problem, however, is that many consumers are completely unaware of the privacy implications of these services, which makes it difficult for consumers to exercise informed choices about the sites they visit and the data they disclose. In many instances, consumers pay for "free" content and services by disclosing their personal information. Their data are then used to generate targeted advertising that subsidizes online activities.

I am especially troubled by the asymmetry between consumer perceptions and business realities. If consumers do not comprehend how their personal information is collected and used, it is impossible for them to knowingly consent to either disclosure or use. And once data are shared, they cannot simply be recalled or deleted. The cumulative consequences for consumers are magnified, whether they realize it or not.

It is possible that small, discrete disclosures of information do not raise concerns for an individual consumer. But large aggregations of data, based on a lifetime of commercial activity, might evoke a different response. I fear we may reach a "tipping point" whereby consumers decide they want to exercise greater control over the use of their data, but their attempts to exercise control become futile, because so much of their digital life already has been exposed.

Industry attempts to provide notice and choice to consumers have been insufficient thus far. I hope we would all agree that disclosures about information collection, use, and control are not meaningful if they are buried deep within opaque privacy policies. Even if we can decipher the cryptic disclosures, they provide consumers with no meaningful access or choice, which renders those concepts largely illusory. We have strayed far from the Fair Information Practices that should serve as a baseline for any comprehensive privacy legislation.

All of this matters because consumers really do care about their personal privacy, and are willing to take steps to protect it. The findings of the Turow/Hoofnagle report conclude that 66 percent of American adults *reject* tailored ads to begin with. That number increases to over 75 percent when consumers are actually educated about the relevant marketing techniques. Yet, companies are not delivering the privacy protections that consumers prefer.

Even where consumers have the ability to opt-out, the effects are limited. If consumer data are unavailable from one source, often they can be obtained from another. Flash cookies and other

technology largely circumvent cookie controls. We may soon long for the day when all we worried about were cookies. For every company crafting a response that addresses notice, choice, or transparency, there are several more firms trying to parse and evade the intent of Commission guidance. We have entered a digital arms race, and the current outlook is troubling.

**Privacy = Consumer Protection + Competition**

Privacy issues are important enough that the Commission should use every possible tool at its disposal. During my term as a Commissioner, I have been immersed in both consumer protection and competition issues. I have steadfastly argued that the Commission should apply its competition expertise to the privacy arena.

For example, when the Commission approved the Google/DoubleClick merger in December 2007, I wrote a dissenting statement that, among other things, highlighted the nexus between privacy and competition. While my colleagues at the time disagreed with my premise, subsequent changes in the marketplace have reinforced the validity of my concerns, as well as my premise that privacy protection is increasingly viewed as a non-price dimension of competition.

My dissent in Google/DoubleClick proposed the concept of a market for data itself, separate from markets for the services fueled by the data. The dissent discussed John Battelle's "database of intentions" concept, which he describes as the "aggregate results of every search ever entered, every result list ever tendered, and every path taken as a result." Battelle asserts that no single company controls this collection of information, but posits that a few select companies share control. One of my key concerns in Google/DoubleClick was that the merged entity might move closer to dominating the database of intentions, and that the network effects generated by combining the two firms might have long-term negative consequences for consumers. In response to questions raised

Page 4 of  6

during the concurrent U.S. and EU review of the proposed Google/DoubleClick merger, Google assured regulators that the deal was not motivated by a desire to enter the behavioral advertising market. In March of this year, however, the company did in fact begin to engage in interest-based, or behavioral, advertising.

And last month, Google purchased mobile advertising company AdMob. This acquisition enhanced Google's ability to extend its advertising strategy into the fast-growing mobile market – a important market in which I hope, and expect, the Commission will remain vigilant.

Turbulent economic times are forcing companies to seek out new sources of revenue. Those sources are driven, in turn, by increasingly large amounts of data, as well as the ability to mine the various connections between pieces of data. As firms continue to develop new data-based markets – including, for example, cloud computing and smart grid services – we must engage in more serious inquiries regarding both the privacy and competition issues that affect consumers.

It is worth noting that, to the extent one might define a putative market for consumer data, recent mergers have further concentrated the competitive landscape. It may also be the case that Comcast's announced acquisition of NBC from GE should be analyzed from both competition and consumer protection angles.

In any event, competition on the basis of privacy protection is likely to increase as consumer awareness grows. The issues raised by data collection and use provide ripe opportunities for companies to develop pro-consumer privacy tools, and to market these features to distinguish themselves from competitors.

**Conclusion**

I know the Commission will continue to be the thought leader on privacy. I will certainly do my part to push the Commission, as I have done for six years now, by challenging mainstream opinions and asking tough questions. Wherever the conversation may lead, I am proud of the efforts of talented Commission staff, and extremely gratified that we have reached the point where we are hosting today's roundtable.

Thank you.