# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| JOHN NASHEL and TIM ROBINSON, individually and on behalf of all others similarly situated, | Case No. 2:22-cv-10633-SJM-DRG<br><br>Honorable Stephen J. Murphy III |
| Plaintiffs, | |
| v. | |
| THE NEW YORK TIMES COMPANY, | |
| Defendant. | |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT

## STATEMENT OF ISSUES PRESENTED

1. Whether Plaintiffs state a claim for relief where they allege that Defendant disclosed their Personal Reading Information during the relevant time period, including to whom those disclosures were made?

**Plaintiffs: Yes**

2. Whether Plaintiffs' claims are governed by a six-year statute of limitations, as every court to consider the issue has concluded, rather than a three-year statute of limitations?

**Plaintiffs: Yes**

## CONTROLLING AND MOST IMPORTANT AUTHORITIES

- M.C.L. § 600.5813

- *Palmer Park Square, LLC v. Scottsdale Ins. Co.*, 878 F.3d 530 (6th Cir. 2017)

- *Pratt v. KSE Sportsman Media, Inc.*, --- F. Supp. 3d ---2022 WL 469075 (E.D. Mich. Feb. 15, 2022)

- *DiPonio Const., Inc. v. Rosati Masonry Co., Inc.*, 631 N.W.2d 59 (Mich. App. 2001)

- *Dep't of Envtl. Quality v. Gomez*, 896 N.W.2d 39 (Mich. App. 2016)

- *Citizens of Pretrial Justice v. Goldfarb*, 327 N.W.2d 910 (Mich. 1982)

- *Estes v. Idea Eng'g & Fabrications, Inc.*, 649 N.W.2d 84 (Mich. App. 2002)

- *Coulter-Owens v. Time Inc.*, 695 F. App'x 117 (6th Cir. 2017)

- *Kinder v. Meredith Corp.*, 2014 WL 4209575 (E.D. Mich. Aug. 26, 2014)

- *Horton v. GameStop, Corp.*, 380 F. Supp. 3d 679 (W.D. Mich. 2018)

- *Cain v. Redbox Automated Retail, LLC*, 981 F. Supp. 2d 674 (E.D. Mich. 2013)

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ............................................................................................iv

TABLE OF AUTHORITIES .......................................................................................v

INTRODUCTION ......................................................................................................1

FACTUAL ALLEGATIONS........................................................................................4

ARGUMENT ..............................................................................................................5

   I.   Plaintiffs State a Claim for Violation of the PPPA ....................................5

   II.  Plaintiffs' Claims Are Timely .................................................................18

   III.   Plaintiffs' Claims Were Tolled by Michigan's COVID-19 Executive and Administrative Orders Related to Statutes of Limitation.............................................24

CONCLUSION ........................................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................13

*Blaha v. A.H. Robins & Co.*,
  708 F.2d 238 (6th Cir. 1983) ..........................................................25

*Boelter v. Hearst Commc'ns, Inc.*,
  192 F. Supp. 3d 427 (S.D.N.Y. 2016) ......................................... 1, 6

*Bowles v. Sabree*,
  2022 WL 141666 (E.D. Mich. Jan. 14, 2022) .................................25

*Bowman v. Greene*,
  2013 WL 5925995 (Mich. Ct. App. Nov. 5, 2013) ..........................22

*Bownes v. Borroughs Corp.*,
  2021 WL 1921066 (W.D. Mich. May 13, 2021) ..............................25

*Cain v. Redbox Automated Retail, LLC*,
  981 F. Supp. 2d 674 (E.D. Mich. 2013).................................... 8, 15

*Citizens for Pretrial Justice v. Goldfarb*,
  327 N.W.2d 910 (Mich. 1982)..................................................19, 24

*Dabish v. McMahon*,
  818 F. App'x 423 (6th Cir. 2020)....................................................23

*Dep't of Envtl. Quality v. Gomez*,
  896 N.W.2d 39 (Mich. Ct. App. 2016) ...........................................24

*DiPonio Constr. Co. v. Rosati Masonry Co.*,
  631 N.W.2d 59 (Mich. Ct. App. 2001) ...............................19, 20, 24

*Estes v. Idea Eng'g & Fabrications, Inc.*,
  649 N.W.2d 84 (Mich. App. 2002) ..................................................21

*Fisher v. Perron*,
  30 F.4th 289 (6th Cir. 2022) ..........................................................16

*Ford Motor Co. v. Michigan Consol. Gas Co.*,
  2009 WL 3190418 (E.D. Mich. Sept. 29, 2009) .............................22

*Hall v. Farm Journal, Inc.*,
  No. 2:21-cv-11811 (E.D. Mich. Apr. 5, 2022)..........................19, 23

*Horton v. GameStop, Corp.*,
  380 F. Supp. 3d 679 (W.D. Mich. 2018) ..................................passim

*In re Ford Motor Co. ERISA Litig.*,
  590 F. Supp. 2d 883 (E.D. Mich. 2008).............................................6

*Jimenez v. Allstate Indem. Co.*,
  2009 WL 440958 (E.D. Mich. Feb. 23, 2009) ...................................6

*Krassick v. Archaeological Inst. of Am.*,
  2022 WL 2071730 (W.D. Mich. June 9, 2022) .....................19, 20, 23

*Landgraf v. USI Film Prods.*,
  511 U.S. 244 (1994) .................................................................................1

*Mackey v. Rising*,
  2021 WL 4034226 (E.D. Mich. Sept. 3, 2021) ...................................25

*Marks v. Hulstrom*,
  2010 WL 2134303 (Mich. Ct. App. May 27, 2010).............................23

*McCree v. Cont'l Mgmt., LLC*,
  2021 WL 1050115 (Mich. Ct. App. Mar. 18, 2021) ............................22

*Moeller v. Am. Media, Inc.*,
  235 F. Supp. 3d 868 (E.D. Mich. 2017)................................................6

*Moore v. Direct Holdings America, Inc.*,
  No. 2:19-cv-14418 (S.D. Fla.) .............................................................15

*Nat'l Sand v. Nagel Constr., Inc.*,
  451 N.W.2d 618 (Mich. Ct. App. 1990) ..............................19, 20, 21, 23

*Olschefski v. Northville Pub. Sch.*,
  2002 WL 1482610 (Mich. Ct. App. July 9, 2002)...............................21

*Palmer Park Square, LLC v. Scottsdale Ins. Co.*,
  878 F.3d 530 (6th Cir. 2017) ....................................................19, 20, 24

*Perlin v. Time Inc.*,
  237 F. Supp. 3d 623 (E.D. Mich. 2017).................................................6

*Pratt v. KSE Sportsman Media, Inc.*,
  2022 WL 469075 (E.D. Mich. Feb. 15, 2022) .............................passim

*Purnell v. Arrow Fin. Servs., LLC*,
  2009 WL 1508340 (E.D. Mich. May 29, 2009) ...................................20

*Ruppel v. Consumers Union of United States, Inc.*,
  2017 WL 3085365 (S.D.N.Y. June 12, 2017) .......................................6

*Smith v. Hilliard*,
  578 F. App'x 556 (6th Cir. 2014)........................................................25

*Straus v. Governor*,
  592 N.W.2d 53 (Mich. 1999)..............................................................24

*Wheaton v. Apple Inc.*,
  2019 WL 5536214 (N.D. Cal. Oct. 25, 2019) ...............................13, 14

## Statutes

H.B. 5331, 84th Leg. Reg. Sess., P.A. No. 378, §§ 1-4 (Mich. 1988), *id.* § 5, added by
     H.B. 4694, 85th Leg. Reg. Sess., P.A. No. 206, § 1 (Mich. 1989)....................................1
M.C.L. § 600.5805(2).......................................................................................................passim
M.C.L. § 600.5813 ...........................................................................................................passim
Michigan's Video Rental Privacy Act ("VRPA") ........................................................passim
S.B. 490, 98th Leg., Reg. Sess., P.A. No. 92 (Mich. 2016) (codified at M.C.L. §
     445.1711, *et seq.*).......................................................................................................1

## Other Authorities

Mich. Executive Order 2020-122............................................................................................24
Mich. Executive Order 2020-58..............................................................................................24
Mich. Supreme Court Administrative Order 2020-18........................................................24
Mich. Supreme Court Administrative Order 2020-3..........................................................24

## Rules

Fed. R. Civ. P. 8 ...................................................................................................................... 3, 6

Plaintiffs John Nashel and Tim Robinson submit this response in opposition to the Motion to Dismiss (ECF No. 20 (the "Motion" or "Mot.")) filed by Defendant.

## **INTRODUCTION**

In this consumer class action, Plaintiffs allege Defendant violated Michigan's Preservation of Personal Privacy Act ("PPPA")[1] by disclosing, without their consent, information that identified them as (*inter alia*) subscribers to *The New York Times*. On behalf of themselves and others similarly situated, Plaintiffs seek to recover $5,000, as provided by the PPPA, for each of Defendant's statutory violations.

Defendant moves to dismiss the operative First Amended Complaint ("FAC") for failure to state a claim on the grounds that the FAC fails to adequately allege facts showing that Defendant disclosed Plaintiffs' subscription-purchase information to third parties during the relevant pre-July 31, 2016 time period or, alternatively, that the claims alleged in the FAC are time-barred by the three-year limitation period set forth in

---

[1] The PPPA (occasionally referred to in the caselaw as the "Video Rental Privacy Act" or the "VRPA") is found at H.B. 5331, 84th Leg. Reg. Sess., P.A. No. 378, §§ 1-4 (Mich. 1988), *id.* § 5, added by H.B. 4694, 85th Leg. Reg. Sess., P.A. No. 206, § 1 (Mich. 1989). In May 2016, the Michigan legislature amended the PPPA. *See* S.B. 490, 98th Leg., Reg. Sess., P.A. No. 92 (Mich. 2016) (codified at M.C.L. § 445.1711, *et seq.*). The May 2016 amendment to the PPPA, which became effective on July 31, 2016, does not apply retroactively to claims that accrued prior to its July 31, 2016 effective date. *See Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 439-41 (S.D.N.Y. 2016) (holding that "the amendment to the [PPPA] does not apply to Plaintiffs' claims, and the Court will assess the sufficiency of those claims under the law as it was when Plaintiffs' claims accrued.") (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244, 286 (1994)). Because the claims alleged herein accrued, and thus vested, prior to the July 31, 2016 effective date of the amended version of the PPPA, the pre-amendment version of the PPPA applies in this case. *See Horton v. GameStop, Corp.*, 380 F. Supp. 3d 679, 683 (W.D. Mich. 2018).

1

Michigan Compiled Laws ("M.C.L.") § 600.5805(2). Both grounds for dismissal are baseless.

First, the factual allegations of the FAC easily state a claim for relief for violation of the PPPA that accrued during the relevant pre-July 31, 2016 time period. Plaintiffs allege that Defendant sold, rented, exchanged, and otherwise disclosed its entire customer database – containing, *inter alia*, *all* of its customers' (including Plaintiffs') full names, the titles of written materials they purchased, and their home addresses – to various third parties. Plaintiffs allege when the disclosures occurred (prior to July 31, 2016 and within the applicable limitation period, with the benefit of 101 days of tolling pursuant to the Governor of Michigan's Executive Orders issued during the COVID-19 pandemic). Plaintiffs allege the identities of several of the third parties to whom Defendant disclosed this information (and discovery will undoubtedly reveal numerous more). Plaintiffs allege that Defendant disclosed *all* of its customers' personal information (including Plaintiffs' and every Class member's) during that time period. And Plaintiffs even provide screenshots of Defendant's "data cards" – advertising the sale, rental, and exchange of this information on the open market – and specifically allege that Defendant's practices of selling, renting, exchanging, and otherwise disclosing all of its customers' information during the relevant pre-July 31, 2016 time period were the same then as they were at the time those data cards were advertised online. Moreover, Plaintiffs bolster these allegations with a copy of Defendant's "Privacy Policy" in effect for the duration of the pre-July 31, 2016 time period, in which

2

Defendant admits that it rents and exchanges its customers' information with third parties. These factual allegations, which must be accepted as true for purposes of deciding the Motion, are detailed and robust, and go far beyond what Rule 8 requires. Indeed, courts across the country in other PPPA publication cases have concluded that plaintiffs have stated plausible claims for relief under the statute based on factual allegations that were far less detailed and specific than the allegations made in the FAC here.

Second, it is now well established that "[a] six-year statute of limitations applies to PPPA claims." *Pratt v. KSE Sportsman Media, Inc.*, --- F. Supp. 3d ---, 2022 WL 469075, at *5 (E.D. Mich. Feb. 15, 2022). Indeed, three federal district courts in Michigan (in both the Eastern and Western Districts) have uniformly held that PPPA claims are subject to the six-year period found in section 600.5813 (not the three-year period found in 600.5805(2)). As each of these courts explained, any attempt to invoke the three-year limitation period found in section 600.5805(2) is foreclosed by controlling Sixth Circuit precedent holding that all statutory claims under Michigan law are subject to the six-year period found in section 600.5813. This Court should adopt the reasoning of these prior decisions on the same issue and hold that section 600.5813's six-year limitation period governs Plaintiffs' claims. The Court should also find that the six-year limitation period was tolled for 101 days pursuant to the Executive Orders issued by the Governor of Michigan during the COVID-19 pandemic. Under the six-year limitation period, and affording Plaintiffs and Class members the benefit of 101 days of

tolling pursuant to the Governor's Executive Orders, the Court should conclude that any disclosures of Plaintiffs' and Class members' personal information that occurred between December 15, 2015 and July 30, 2016 are actionable.

The Complaint states a timely claim for relief—the Motion should be denied.

## FACTUAL ALLEGATIONS

Defendant maintains a vast digital database comprised of its customers' information—full names, publications subscribed to, and home addresses (collectively "Private Reading Information" or "PRI"), as well as myriad other categories of individualized data and demographic information. FAC ¶ 49.

At various times during the pre-July 30, 2016 time period, Defendant disclosed Plaintiffs' Private Reading Information, which identified each as a *The New York Times* customer. *Id.* ¶ 69. First, Defendant disclosed mailing lists containing Plaintiffs' Private Reading Information to data aggregators and data appenders, which then supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to Defendant. *Id.* ¶¶ 4-5, 70. Second, Defendant disclosed mailing lists containing Plaintiff's Private Reading Information to data cooperatives, who in turn gave Defendant access to their own mailing list databases. *Id.* ¶ 71. And third, Defendant rented and/or exchanged its mailing lists containing Plaintiff's Private Reading Information – enhanced with additional information from data aggregators and appenders – to third parties, including other consumer-facing companies, direct-mail advertisers, and other solicitors. *Id.* ¶¶ 68, 72.

By renting, exchanging, or otherwise disclosing the Private Reading Information of Plaintiffs and its other Michigan-based subscribers during the relevant pre-July 30, 2016 time period, Defendant violated the PPPA. *Id.* ¶ 9.

## **ARGUMENT**

The factual allegations of the FAC state a claim for violation of the PPPA, and Plaintiff's claim is timely. The Motion should be denied.

## I. **Plaintiffs State a Claim for Violation of the PPPA**

Defendant moves to dismiss the FAC for failure to state a claim for violation of the PPPA. The motion is without merit. But the FAC contains numerous factual allegations readily giving rise to a plausible claim for relief.

The FAC specifically alleges that Defendant disclosed Plaintiffs' PRI to "data aggregators and data appenders, who then supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to NYT." FAC ¶¶ 17, 70. The FAC also specifically alleges that Defendant "disclosed mailing lists containing Plaintiff's Private Reading Information to data cooperatives, who in turn gave NYT access to their own mailing list databases." *Id.* ¶ 71. And the FAC specifically alleges that Defendant "rented and/or exchanged its mailing lists containing Plaintiff's Private Reading Information – enhanced with additional information from data aggregators and appenders – to third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes." *Id.* ¶ 72. The FAC alleges that

Defendant disclosed its *entire* digital customer database (comprised of the Private Information of *all* of its customers, including all Class members) to these third parties. *Id.* ¶ 11. The FAC alleges that these disclosures occurred during the relevant pre-July 31, 2016 time period. *Id.* ¶¶ 1, 11, 69.

Numerous courts across the country, including in this District, have held such factual allegations sufficient to state a claim for a violation of the PPPA. *See, e.g., Perlin v. Time Inc.*, 237 F. Supp. 3d 623, 641-42 (E.D. Mich. 2017); *Moeller v. Am. Media, Inc.*, 235 F. Supp. 3d 868, 873 (E.D. Mich. 2017); *Horton v. GameStop, Corp.*, 380 F. Supp. 3d 679, 682 (W.D. Mich. 2018); *Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 452 (S.D.N.Y. 2016).

Rather than tackle that overwhelming weight of authority, Defendant attacks the FAC for failing to <u>prove</u> that Plaintiffs' and the Class's PRI was wrongfully disclosed by Defendant during the relevant time period. But the FAC is governed by the liberal Rule 8 pleading standard. *See Jimenez v. Allstate Indem. Co.*, 2009 WL 440958, at *1 (E.D. Mich. Feb. 23, 2009) (Murphy, J.) ("In assessing a motion brought pursuant to Rule 12(b)(6), the Court must presume all well-pleaded factual allegations in the complaint to be true and draw all reasonable inferences from those allegations in favor of the non-moving party."). Under Rule 8, Plaintiffs are not required to prove their claims with "documents" or any other evidence at this time. They must merely allege facts plausibly demonstrating that Defendant violated the PPPA. *See In re Ford Motor Co. ERISA Litig.*, 590 F. Supp. 2d 883, 918 n.19 (E.D. Mich. 2008) (Murphy, J.) ("Rule 8(a)'s notice

pleading requirement" does not "require[] plaintiffs to satisfy an evidentiary burden before evidence is developed.").

Plaintiffs have easily satisfied this standard. Plaintiffs' allegations, taken as true as they must be at this stage of the case, establish that Defendant's entire customer database (containing the personal, PPPA-protected data pertaining to all of its customers, including Plaintiffs and each Class member) was rented and otherwise disclosed to various third parties throughout the relevant pre-July 31, 2016 time period. *See, e.g.*, FAC ¶¶ 2-8; 69-72. Indeed, the FAC specifically alleges that:

> During the relevant pre-July 31, 2016 time period, *i.e.*, between March 24, 2016 and July 30, 2016, numerous list brokers, data aggregators, data cooperatives, data brokers, and others, including but not limited to NextMark, Experian, Direct Magazine, and, on information and belief, Infogroup (now known as Data Axle), acting as third-party intermediaries on behalf of NYT, obtained from NYT and then disclosed to numerous other third parties the Private Reading Information of all of the subscribers and recently expired subscribers to *The New York Times* and NYT's other publications. In addition to disclosing to numerous list brokers, data aggregators, data cooperatives, data brokers, and other such entities during the relevant pre-July 31, 2016 time period, NYT also disclosed all of its customers' Private Reading Information to other publishers (and their agents and affiliates) in exchange for the private reading information of individuals who had purchased publications from those publishers.

FAC ¶ 2. These allegations, standing alone, are more than sufficient to state a claim for violation of the PPPA. *See, e.g.*, *Horton*, 380 F. Supp. 3d at 682 ("Given that GameStop possessed the *Game Informer* subscription information and that NextMark purported to sell that information, the implication that GameStop disclosed the information to NextMark or other data-mining companies passes the threshold of plausibility"); *Cain*

*v. Redbox Automated Retail, LLC*, 981 F. Supp. 2d 674, 685 (E.D. Mich. 2013) (holding, in PPPA case, that at the motion to dismiss stage "this Court must take Plaintiffs' allegations regarding the relationship between Defendant and its 'unrelated' vendors as true").

Defendant asserts that "[t]he Amended Complaint contains no allegations about the actual disclosure of any customer's (let alone, Plaintiffs') information: not which customers' information was supposedly disclosed or to whom, or when that disclosure purportedly occurred." Nothing could be further from the truth. The FAC specifically alleges "which customers' information" was disclosed: the information of all of Defendant's active and recently expired subscribers, including Plaintiffs and the members of the Class. FAC ¶¶ 2, 6, 54, 70-72. The FAC specifically alleges "to whom" those disclosures were made: "to data aggregators and data appenders," "data cooperatives," and "other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes," including specifically "NextMark, Experian, Direct Magazine, and . . . Infogroup (now known as Data Axle)."[2] *See id.* ¶¶ 2, 70-72. And the FAC specifically alleges "when th[ose]

---

[2] The Motion completely fails to address the FAC's specific allegations that Defendant disclosed Plaintiffs' and Class members' PRI, during the relevant pre-July 31, 2016 time period, to NextMark, Experian, Direct Magazine, and Infogroup (now known as Data Axle). There's some irony in the fact that the Motion complains about a purported lack of specificity in the FAC's allegations, but then fails to even address the FAC's allegations specifically identifying four third parties who received disclosures from the Defendant containing Plaintiffs' and Class members' PRI.

disclosures . . . occurred": on a regular and systematic basis "during the pre-July 31, 2016 time period," which is the period from December 15, 2015 through July 30, 2016 (after Plaintiffs are afforded the benefit of tolling from the Governor of Michigan's executive orders issued during the COVID-19 pandemic).[3] *See* FAC ¶¶ 2, 29, 69.

The FAC, however, does not stop there, and goes on to allege numerous additional supporting facts concerning Defendant's disclosure practices and the timing of those practices. First, the FAC includes copies of Defendant's publicly accessible datacards from 2007 and 2008, which demonstrate that Defendant publicly offered its entire subscriber database for rental (to anyone interested in purchasing it) in 2007 and 2008 as a "mailing list," which included the full names and postal addresses for all of Defendant's active and recently expired subscribers (*id.* ¶¶ 3-4). The FAC alleges that Defendant disclosed the entirety of those lists (*see* "*Universe*/Base Rate") to Experian, among other entities, to supplement, or enhance, the data with additional demographic, geographic, and lifestyle data (*id.* ¶ 5).

Although Defendant attacks the datacards included in the FAC as pre-dating the

---

[3] The "relevant pre-July 31, 2016 time period," as that phrase appears in the Complaint, is March 25, 2016 through July 30, 2016. The limitation period applicable to a PPPA claim is six years (discussed *infra,* Section IV, Part B), and six years is 2,190 days. 2,190 days prior to March 24, 2022 (the date on which the Complaint was filed) is March 25, 2016. *See Pratt*, 2022 WL 469075, at *7 n.6 (calculating limitation period the same way). However, the applicable six-year limitation period was tolled for 101 days pursuant to Executive Orders issued by the Governor of Michigan during the COVID-19 pandemic. *See infra* Section IV, Part C. Thus, any disclosures by Defendant of Plaintiffs' and Class members' PRI between December 15, 2015 (the 2,291st day prior to March 24, 2022) and July 30, 2016 are actionable in this case.

relevant pre-July 31, 2016 time period (Mot. at 9-10, PageID.1286-87)[4], the FAC specifically alleges that Defendant continued to systematically engage in the same wholesale disclosure practices as advertised in the 2007 and 2008 datacards over the course of the next decade plus. *See* FAC ¶ 6 ("Although at some point NYT ceased making its "data cards" available on list brokers' publicly accessible websites (the data cards shown above are no longer publicly advertised online) NYT nonetheless continued to sell, rent, exchange, and/or otherwise disclose all of its subscribers' Private Reading Information to data aggregators, data appenders, data cooperatives, and list brokers, among others, throughout the relevant pre-July 31, 2016 time period.") & FAC ¶¶ 29, 54.[5]

---

[4] The Motion also says that "the 2007 and 2008 'data cards' do not even indicate what type of information is included with the mailing list at all, let alone that the mailing list contains PRI for Michigan subscribers, including Plaintiffs." But the FAC alleges that the information contained within the mailing lists advertised on the data cards included the "Personal Reading Information," defined in the FAC as the "full names, titles of publications subscribed to, and home addresses" (FAC ¶ 11), of all subscribers and recently expired subscribers to *The New York Times*, including Plaintiffs and all Class members. These factual allegations, which are corroborated by the data cards themselves, which offer the sale of the "total universe" of Defendant's customers, FAC ¶¶ 3-4, and indicate that the medium for persons who purchase the list to contact the persons on the list is by postal mail (as shown by the postal mail emblem next to the "MEDIUM" field on the data cards), which confirms that the lists advertised contain full names and addresses for each person listed. These allegations must be accepted as true, and all reasonable inferences must be drawn from them in Plaintiffs' favor. There is thus no merit in Defendant's assertion that the FAC fails to adequately allege disclosures by Defendant of <u>all</u> of its customers' names and addresses (including Plaintiffs' and all Class members') to third parties (including but not limited to those specifically identified in the FAC) during the relevant pre-July 31, 2016 time period.

[5] Defendant also argues that "the [FAC's] reliance on information provided by third-party data brokers fails to support Plaintiffs' assertion that The Times *itself* was the one

The FAC bolsters this allegation by further alleging that, throughout the entire relevant pre-July 31, 2016 time period, Defendant itself admitted, in its "Privacy Policy" accessible via a fine-print hyperlink at the bottom of its website[6], that "[i]f you are a print subscriber, we may exchange or rent your name and mailing address … and certain other information, such as when you first subscribed to The New York Times with other reputable companies that offer marketing information or products through direct mail." *Id.* ¶ 6. The FAC attaches, as Exhibit D, a copy of the archived version of that Privacy Policy that was accessible on Defendant's website on July 31, 2016 (and which

---

'renting, exchanging, or otherwise disclosing' PRI." (Mot at 9, PageID.1287.). This also misses the mark. For one thing, the FAC specifically alleges that these "third-party data brokers" (*id.*) were in fact "acting as third-party intermediaries on behalf of NYT (FAC ¶ 2). Furthermore, the significant thing is that the PRI of Defendant's subscribers was sold <u>on the open market</u>, not <u>who sold</u> the PRI. There is only one original source of the *The New York Times* subscriber database: the Defendant. Thus, regardless whether the PRI advertised on a third-party data broker's website (or anywhere else for that matter) is sold or provided to the end-purchaser by Defendant directly or by a third-party data broker indirectly (or any other entity as an intermediary), the underlying PRI necessarily originated from, and was thus disclosed in the first instance by, the Defendant – and therefore evidences a PPPA violation committed by Defendant just the same. The distinction the Motion attempts to draw therefore makes no sense.

[6] While the "privacy policy" in effect during the relevant pre-July 31, 2016 time period discloses the company's PPPA-violative practices of renting, exchanging, and otherwise disclosing its customers' PRI (which is perfectly consistent with the datacards from 2007 and 2008 and the allegations that these disclosure practices continued through at least 2020), neither the Plaintiffs nor any Class members manifested their assent to the terms of that document. As the FAC specifically alleges, "[r]egardless of how [a] consumer subscribes [to one of NYT's publications], NYT never required the individual to read or affirmatively agree to any terms of service, privacy policy, or information-sharing policy during the relevant pre-July 31, 2016 time period. Consequently, during the relevant pre-July 31, 2016 time period, NYT uniformly failed to obtain any form of consent from – or even provide effective notice to – its customers before disclosing their Private Reading Information." (FAC ¶ 55.)

had remained in the same form since its "last update[]" on June 10, 2015). *Id.* & *id.,* Ex. D at 1 (reflecting date on which page was captured, as well as statement that the page had been "last updated on June 10, 2015). The FAC's attachment of the July 31, 2016 version of Defendant's Privacy Policy (which had existed in the same form since June 10, 2015) is sufficient, by itself, to give rise to a plausible inference that Defendant disclosed Plaintiffs' PRI during the relevant pre-July 31, 2016 time period in violation of the PPPA. Additionally, the FAC alleges that Defendant's subscriber list was available for rental as recently as 2020, when the city of Virginia Beach was reported to have rented Defendant's subscriber list for marketing purposes. (FAC ¶ 7).

According to Defendant, the FAC contains merely "generalized allegations about irrelevant facts that fall well outside of the narrow time period relevant to this case." *See* Mot. at 1-2, PageID.1279-80. But as previously discussed, these facts are far from "irrelevant," and indeed collectively demonstrate that Defendant was systematically disclosing, at periodic intervals (typically monthly or bi-monthly), the PRI of <u>all of its subscribers and recently expired subscribers</u>, which would have included Plaintiffs and all members of the proposed Class for the disclosures that Defendant made of its customer list during the relevant pre-July 31, 2016 time period. Moreover, as FAC explains, the allegations described above "are but a handful of <u>examples</u> to illustrate NYT's practices of selling, renting, exchanging, and/or otherwise disclosing the Private Reading Information of its entire subscriber-base during the relevant pre-July 31, 2016 time period," and that "[t]he reality is that NYT disclosed its subscribers' Private

12

Reading Information, including that of the Plaintiffs and the members of the Class, to numerous third parties (the identities of which are not fully known at this time) without consent during this time frame." FAC ¶ 8 (emphasis added). Nonetheless, these examples plausibly demonstrate a pattern and practice by Defendant of systematically disclosing all of its customers' PRI from at least as early as 2006 through 2020, including for the duration of the relevant pre-July 31, 2016 time period.

Significantly, the FAC alleges that "[a]s a result of NYT's practices of disclosing their Private Reading Information during the relevant pre-July 31, 2016 time period, Plaintiffs saw a dramatic uptick of junk mail in their mailboxes over the same time period." FAC ¶ 17. The Motion does not even address this allegation.

Against this backdrop, Plaintiffs have clearly alleged facts from which it can plausibly be inferred that Defendant disclosed their (and the rest of its customers') PRI during the relevant time period. Indeed, even if one of the foregoing sets of allegations – *e.g.*, the publicly available 2007-08 data cards, or the 2016 privacy policy, or the uptick in junk-mail to Plaintiffs that coincided with Defendant's alleged disclosures of their PRI – is not enough, standing alone, to plausibly state a claim for relief, there can be no doubt that all of these allegations, taken together, collectively create "enough facts to state a claim to relief that is plausible on its face" and crosses "the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Defendant cites to an unpublished, non-binding district court decision in *Wheaton v. Apple Inc.*, 2019 WL 5536214 (N.D. Cal. Oct. 25, 2019) in support of its

13

argument that the data cards attached to the FAC are "insufficient" to state a PPPA claim. (Mot. at 9-10, PageID.1287-88.) *Wheaton* is readily distinguishable. For one thing, the FAC here contains many sets of factual allegations concerning disclosures (made by a publisher pursuant to standard, industry-wide practices (*see* FAC ¶ 41), not by a technology company like Apple) that were not alleged by the plaintiff in *Wheaton*. Moreover, in *Wheaton*, the plaintiffs alleged violations of the PPPA arising from alleged disclosures of the music stored on their phones, and relied on Nextmark data cards advertising the sale of this sort of data to bolster those allegations. *Id.* at *4. However, the defendant in *Wheaton* argued that it was not plausible to infer that Apple was even responsible for disclosing the data offered for sale on the data cards (neither directly nor indirectly through intermediaries) because that information (the existence of music files on a phone), unlike the PRI at issue in a case against a publisher such as the instant matter (which are comprised of records concerning a purchase of a magazine subscription to one of the Defendant's publications), was "not information that would uniquely come from the defendant (as actual lists of the names of who subscribes to a magazine plus their delivery addresses would likely come from the magazine publisher)." *See Wheaton*, 3:19-cv-02883-WHA, docket entry 51 at 11-12 (defendant's reply in support of motion to dismiss). Here, on the other hand, Defendant does not deny the reasonableness of inferring that the rental, sale, or exchange of records reflecting customers' purchases of subscriptions to the *The New York Times* from Defendant would necessarily have originated from the Defendant (either directly or

14

indirectly through intermediaries), including during the relevant pre-July 31, 2016 time period[7]. And in fact, here, unlike in *Wheaton*, the Privacy Policy accompanying the FAC reflects that Defendant admitted to engaging in these practices for the duration of the pre-July 31, 2016 time period. FAC ¶ 6. Finally, *Wheaton* is also the only decision that has ever been issued finding a PPPA plaintiff's allegations insufficient to withstand a motion to dismiss, and Plaintiffs respectfully submit that other courts' decisions on this issue in PPPA cases (such as, *e.g.*, *Horton v. Gamestop* and *Cain v. Redbox Automated Retail, LLC*, cited above) are better reasoned and more persuasive.

---

[7] Typically, when undersigned Plaintiffs' counsel brings an action against a defendant who, for whatever reason, actually did not disclose the plaintiff's Personal Reading Information during the relevant time period, counsel for the defendant will reach out to plaintiff's counsel and provide a sworn declaration from the defendant attesting that it made no disclosures of the plaintiff's PRI to any third parties during that time period, at which point the plaintiff typically dismisses the case. Indeed, counsel for the Defendant in this case has provided such declarations to Plaintiffs' counsel in other similar actions, resulting in their dismissal. *See, e.g.*, *Moore v. Direct Holdings America, Inc.*, No. 2:19-cv-14418 (S.D. Fla.). Here, by contrast, Defendant not only has not offered to provide such a declaration, but it has also filed a motion to certify the statute of limitations question (discussed further below, *infra* Section IV, Part B) to the Michigan Supreme Court – a motion that the company asks the court to decide only after it denies the instant motion to dismiss (*see* ECF No. 21 at 2, PageID.1387). The filing of the motion to certify the statute of limitations question to the Michigan Supreme Court is telling, because the motion would be unnecessary if the allegations of the FAC were untrue. Moreover, by filing the motion to certify together with the motion to dismiss, rather than after the motion to dismiss is denied, it is clear that Defendant is anticipating losing the motion to dismiss and then planning to seek to stay the commencement of discovery pending a decision on its motion to certify. Defendant clearly does not want Plaintiff to have the opportunity to serve initial sets of discovery requests in this case because, as the FAC alleges, "a reasonable opportunity for discovery will reveal the depth of NYT's wrongdoing" in this case (FAC ¶ 8) – an allegation that rings true in light of the fact that Defendant is bent on doing whatever it can to prolong the commencement of discovery in this case.

Defendant next cites to the decision in *Fisher v. Perron*, 30 F.4th 289 (6th Cir. 2022), which is also inapposite. *Fisher* involved the common law tort of public disclosure of private rights; not the PPPA. *Id.* at 296. And in *Fisher*, the plaintiff failed to plead "when" the alleged wrongful disclosures were made, "who" they were made to, and "whether" they "contained private information." *Id.* at 297. Here, by contrast, Plaintiffs plead when the alleged wrongful disclosures were made (on a regular and systematic basis "during the pre-July 31, 2016 time period," which is between December 15, 2015 and July 30, 2016 with the benefit of COVID tolling, *see* FAC ¶¶ 2, 29, 69); to whom the disclosures were made ("to data aggregators and data appenders," "data cooperatives," and "other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes," including specifically NextMark, Experian, Direct Magazine, and Infogroup (now known as Data Axle, *see id.* ¶¶ 2, 70-72)); and what the disclosures contained (at minimum, the "Personal Reading Information," i.e., "full names, titles of publications subscribed to, and home addresses," of <u>all</u> of Defendant's subscribers and recently expired subscribers, including Plaintiffs and all members of the Class, *id.* ¶¶ 2, 11). These are detailed, robust allegations, and a far cry from the sparce allegations found insufficient to state a claim in *Fisher*.

The most apposite decision for purposes of deciding the Motion is *Horton v. GameStop, Inc.,* a decision from the Western District of Michigan that addressed the same grounds for dismissal that Defendant raises in here, in a case that also alleged

violations of the PPPA based on the same type of industry-standard disclosure practices

that another publisher, like the Defendant in this case, made to third parties through its

alleged rentals, sales, and exchanges of its subscriber mailing list. Although the plaintiff's

allegations in *Horton* were far less robust than the allegations made by Plaintiff in the

FAC here, the district court in *Horton* nonetheless denied the defendant's motion to

dismiss on the following grounds:

> GameStop first argues that the facts alleged in the complaint do not rise
> to the level of plausibility that GameStop is liable. GameStop states that
> NextMark, a company that purported to sell *Game Informer* subscriber
> information, says on its website that it does not sell mailing lists, and,
> moreover, that Plaintiff has not established a connection between
> GameStop's alleged disclosure of information and the junk mail and
> solicitations that Horton received. (ECF No. 9 at PageID.51-52.)
> However, Plaintiff attached as Exhibit B to the complaint a printout from
> the NextMark website, in which NextMark claims to sell the *Game Informer*
> *Magazine* mailing list. (ECF No. 1-2 at PageID.24-26.) Horton also alleged
> that the "harassing junk mail offerings and phone call solicitations ... are
> attributable to GameStop's unauthorized sale and disclosure of his
> Personal Reading Information" (ECF No. 1 at PageID.12) and that
> "GameStop's disclosure ... caused an influx of third party print
> advertisements to his home and marketing calls to his telephone" (*Id.* at
> PageID.17). Given that GameStop possessed the *Game Informer*
> subscription information and that NextMark purported to sell that
> information, the implication that GameStop disclosed the information to
> NextMark or other data-mining companies passes the threshold of
> plausibility.

*Horton*, 380 F. Supp. 3d at 682. Based on the factual allegations of the FAC, which

completely overlap all of the allegations made by the plaintiff in *Horton* (and then go

much further), this Court should not hesitate in reaching the same result.

What Defendant really wants to do is turn the PPPA into a toothless tiger. The

crux of this lawsuit is that Defendant *failed to inform* Plaintiffs and the proposed class members that it would disclose their PRI to others and *failed to obtain their consent* prior to disclosing that Information to others. *See generally* FAC. Thus, under the circumstances alleged in the FAC, Plaintiffs and the unnamed class members cannot possibly be expected to allege the specific dates of Defendant's disclosures or all of the entities to whom Defendant made these non-consensual, uninformed disclosures, absent a reasonable opportunity for discovery. By demanding such specificity in the Motion, Defendant asks the Court to adopt a pleading standard that no PPPA plaintiff could ever satisfy, effectively emasculating this important consumer protection statute and inoculating the company from liability under it in the process. This Court need not go along.

The FAC states a claim, and the Motion should be denied.

## II.   <u>Plaintiffs' Claims Are Timely</u>

Defendant also argues that Plaintiffs' "claims are subject to the three-year statute of limitations in M.C.L. § 600.5805(2), not the six-year period that Plaintiffs wrongly assert is applicable to all statutory claims that lack express limitations periods." Mot. at 12, PageID.1290. This argument fails as well.

As Defendant ultimately concedes, only three courts have decided this issue in a PPPA case and all three have "found that the 'catch-all' six-year limitations period under M.C.L. § 600.5813 applies to PPPA claims." Mot. at 18, PageID.1296 (citing *Pratt*, -- F. Supp. 3d --, 2022 WL 469075 (E.D. Mich. Feb. 15, 2022) (Ludington, J.); *Hall v. Farm*

*Journal, Inc.*, No. 2:21-cv-11811, ECF No. 26 (E.D. Mich. Apr. 5, 2022) (Lawson, J.); and *Krassick v. Archaeological Inst. of Am.*, 2022 WL 2071730 (W.D. Mich. June 9, 2022) (Jarbou, J.)). These decisions are well-reasoned and are supported by Sixth Circuit and Michigan appellate authority. *See Palmer Park Square, LLC v. Scottsdale Ins. Co.*, 878 F.3d 530, 540 (6th Cir. 2017) (holding that "§ 600.5813 applies to statutory causes of action, including those for civil fines"); *DiPonio Constr. Co. v. Rosati Masonry Co.*, 631 N.W.2d 59, 66 (Mich. Ct. App. 2001) (holding that "a civil cause of action arising from a statutory violation is subject to the six-year limitation period in § 5813, if the statute itself does not provide a limitation period"); *Citizens for Pretrial Justice v. Goldfarb*, 327 N.W.2d 910, 915 (Mich. 1982) (holding that § 5805 only "applies to traditional, primarily common-law torts"); *Nat'l Sand v. Nagel Constr., Inc.*, 451 N.W.2d 618, 622 (Mich. Ct. App. 1990) (citing *Goldfarb* and stating that because "plaintiffs' injury was not the result of a traditional tort, it must fall under the residual six-year period of limitation [] in § 5813").

The Motion raises the same arguments that were rejected in *Pratt*, *Hall*, and *Krassick*. Mot. at 13-22, PageID.1291-1301. Specifically, Defendant argues that "[a] claim for violation of the PPPA is [] a claim for redress of an invasion of privacy, which is a common law claim that traditionally sounds in tort." *Id.* at 14, PageID.1292. But as Judge Jarbou held in *Krassick*, Plaintiffs' "injury to [their] right to privacy … is not a traditional common-law tort. Although such a right is 'similar in kind' to rights protected by the common-law tort of invasion of privacy, the right to privacy in one's [audiovisual and] reading materials is nonetheless the creation of a statute; it did not

19

exist under common law." *Krassick*, 2022 WL 2071730, at *3. "Accordingly, because '[Plaintiffs'] injury was not the result of a traditional tort, [their claims] must fall under the residual six-year period contained in § 5813.'" *Id.* (quoting *Nat'l Sand*, 451 N.W.2d at 622). "Put another way, because [Plaintiffs'] 'right to recovery' 'arises from a statute' rather than a 'a common-law right,' the six-year limitation period applies." *Id.* (quoting *Nat'l Sand*, 451 N.W.2d at 622 n.7); *see also Purnell v. Arrow Fin. Servs., LLC*, 2009 WL 1508340, at *2 (E.D. Mich. May 29, 2009) ("The mere fact that Plaintiff's allegations may be, in some manner, shoe-horned into a common-law tort cannot control in light of clear direction that where 'plaintiff's civil cause of action [is] for … a statutory violation, [the court should apply] the six-year limitation period found in § 5813.") (citing *DiPonio*, 631 N.W.2d at 66) (alterations in original).

And, as Judge Ludington explained in *Pratt*, Defendant's arguments are foreclosed by the Sixth Circuit's decision in *Palmer Park Square*. As Judge Ludington explained, "[t]he long and the short of the legal analysis is that (1) Michigan law governs this question, (2) no controlling Michigan authority is directly on point, (3) Michigan courts look to federal law in the absence of controlling Michigan law, (4) the Sixth Circuit has released a published opinion interpreting Michigan law to resolve this issue, and (5) published Sixth Circuit precedent is controlling authority for this Court." *Pratt*, 2022 WL 469075, at *5 (citing *Palmer Park*, 878 F.3d at 539-40). Thus, applying the holding of *Palmer Park Square* (and addressing the numerous decisions to which *Palmer Park Square* cites), Judge Ludington correctly and unequivocally held that "[a] six-year

statute of limitations applies to PPPA claims." *Id.*; *see also id.* at *7 ("The Sixth Circuit carefully analyzed Michigan precedent to hold that a six-year statute of limitations applies to statutory causes of action, like the PPPA. That published Sixth Circuit precedent controls this Court."). This Court should now reach the same conclusion.

Indeed, the overwhelming majority of Michigan's state and federal courts are in accord, and correctly hold, consistent with *Goldfarb*, *DiPonio*, and *Palmer Park Square*, that statutory claims (for which no limitation period is specified in the statute itself) are subject to the six-year period found in § 600.5813 and that only common-law tort claims are subject to the three-year period found in § 600.5805(2). *See Nat'l Sand, Inc.*, 451 N.W.2d at 622 n.7 (surveying Michigan authority on the applicability of § 600.5813 and noting that "the common theme shared by" the pertinent cases is that the six-year limitation period found in § 5813 applies where "the right to recovery arose from a statute"); *Estes v. Idea Eng'g & Fabrications, Inc.*, 649 N.W.2d 84, 93 (Mich. App. 2002) (holding that "the catch-all six-year period of limitation set forth in M.C.L. § 600.5813 applies" to a § 489 claim "because § 489 creates a separate cause of action and does not contain its own statute of limitations," and explaining that, even though a § 489 "statutory cause of action is . . . similar to the common law shareholder equitable action for dissolution," it "is independent of that traditionally limited and uncertain cause of action" and thus not subject to the three-year limitation period found in § 600.5805(2)); *Olschefski v. Northville Pub. Sch.*, 2002 WL 1482610, at *3 (Mich. Ct. App. July 9, 2002) (finding that, in light of the decisions in *Goldfarb*, *Nat'l Sand*, *DiPonio*, and *Estes*, "the six-

year statute of limitations under M.C.L. § 600.5813 applies" to plaintiffs' claims, which allege "violations of the Revised School Code, rather than traditional common-law torts," and concluding that "the trial court erred in applying the three-year statute of limitations"); *Bowman v. Greene*, 2013 WL 5925995, at *6 (Mich. Ct. App. Nov. 5, 2013) (citing *DiPonio*, concluding that claim for violation of the Seller's Disclosure Act is governed by § 5813's six-year period); *Ford Motor Co. v. Michigan Consol. Gas Co.*, 2009 WL 3190418, at *16 (E.D. Mich. Sept. 29, 2009) ("This is the exact situation at issue here: a statutory cause of action that does not include a statute of limitations. The court will therefore apply the limitations period found in § 5813."). Thus, because Plaintiffs allege a claim for violation of the PPPA, a statute that does not itself specify a limitation period, Plaintiffs' claims are governed by the six-year limitation period found in § 5813.

Even the decisions Defendant cites in the Motion recognize the critical distinction between common-law claims and statutory claims for purposes of determining the applicable limitation period. *See, e.g.*, *McCree v. Cont'l Mgmt., LLC*, 2021 WL 1050115, at *7 (Mich. Ct. App. Mar. 18, 2021) (noting that § 600.5805(2) only applies to a plaintiff's claims for a defendant's breaches of "common-law duties"); Mot. at 16, PageID.1294 (collecting decisions in which courts correctly found the three-year limitation period found in § 600.5805(2) applicable to common-law tort claims).

Predictably, Defendant also argues that Judge Ludington, Judge Lawson, and Judge Jarbou all got it wrong. *See* Mot. at 18-23, PageID.1296-1301. Indeed, Defendant goes so far as to say *Pratt*, *Hall*, and *Krassick* "contradict[] decades of Michigan precedent

22

that has applied the three-year limitations in Section 600.5805(2) to statutory claims that allege injury to persons, even when the statute was otherwise silent on a limitations period." Mot. at 21, PageID.1299. But those cases involved statutes which subsumed and preempted long-standing common law claims. *See Marks v. Hulstrom*, 2010 WL 2134303 (Mich. Ct. App. May 27, 2010) (nuisance statute at issue directly mirrored, and had thus codified, Michigan's common law nuisance claim); *Dabish v. McMahon*, 818 F. App'x 423 (6th Cir. 2020) (ethnic intimidation statute at issue provided a civil cause of action for victims of battery and assault (traditional common law torts) while simultaneously criminalizing these tortious acts when motivated by bias). Notably, the defendants in *Pratt*, *Hall*, and *Krassick* made the same arguments that Defendant makes here in favor of the three-year limitation period, and in fact cited to the same legal authorities. *See Pratt*, 1:21-cv-11404, ECF No. 17 (motion to dismiss) at PageID. 590-91 (making same arguments and citing to same cases); *Hall*, 2:21-cv-11811, ECF No. 11 (motion to dismiss) at PageID.570-72 (same); *Krassick*, 2-21-cv-00180, ECF No. 12 (motion to dismiss) at PageID.555-56 (same). With the benefit of full adversarial briefing, Judge Ludington, Judge Lawson, and Judge Jarbou all found no merit in these arguments and denied the defendants' motions to dismiss.

In other words, the question of whether to apply the three-year period found in § 600.5805(2) or the six-year period found in § 600.5813 only arises where the claim at issue – unlike the PPPA claim here – is a common-law claim, not a statutory claim. *See, e.g.*, *Nat'l Sand*, 451 N.W.2d at 653 (in considering whether three-year period provided

23

by § 600.5805(2) or six-year period provided by § 600.5813 applies to a non-statutory malpractice claim, "we must determine whether the common law recognized a malpractice claim against engineers"). And where, as here, the claim is for violation of a statute that does not provide its own limitation period, controlling Sixth Circuit precedent (grounded in well-established Michigan law) requires application of the six-year limitation period found in M.C.L. § 600.5813. *See Palmer Park Square*, 878 F.3d at 539-40; *Goldfarb*, 327 N.W.2d at 915; *DiPonio*, 631 N.W.2d at 65-66; *Dep't of Envtl. Quality v. Gomez*, 896 N.W.2d 39, 50-51 (Mich. Ct. App. 2016). The analysis ends there.

### III.  <u>Plaintiffs' Claims Were Tolled by Michigan's COVID-19 Executive and Administrative Orders Related to Statutes of Limitation</u>

Defendant incorrectly states that "Plaintiffs contend" that the actionable statutory period in this case "is March 24, 2016 to July 30, 2016." Mot. at 6, PageID.1284. That is wrong. Although that is the "relevant pre-July 31, 2016 time period" referenced in the FAC, Plaintiffs' claims were tolled for 101 days from March 10, 2020, through June 20, 2020, by Governor Whitmer's Executive Orders and the Michigan Supreme Court's Administrative Order (together, the "COVID-19 Orders") tolling the statute of limitations for all Michigan claims due to COVID-19. *See* Mich. Executive Order 2020-58; Mich. Supreme Court Administrative Order ("SCAO") 2020-3; Mich. Executive Order 2020-122; Mich. SCAO 2020-18.

Under Michigan law "the Governor's action [in issuing an Executive Order] has the status of enacted legislation." *Straus v. Governor*, 592 N.W.2d 53, 57 (Mich. 1999).

"Pursuant to the *Erie* doctrine, state statutes of limitations must be applied by federal courts sitting in diversity." *Blaha v. A.H. Robins & Co.*, 708 F.2d 238, 239 (6th Cir. 1983). "Just as limitations periods are taken from state law, so are the rules regarding tolling." *Smith v. Hilliard*, 578 F. App'x 556, 562 (6th Cir. 2014) (citations omitted). Thus, the COVID-19 Orders tolled the statute of limitations for Plaintiffs' and Class members' PPPA claims from March 10, 2020, to June 20, 2020. *See, e.g.*, *Bownes v. Borroughs Corp.*, 2021 WL 1921066, at *2 (W.D. Mich. May 13, 2021) (finding Michigan state-law claim tolled for 101 days by COVID-19 Orders); *Mackey v. Rising*, 2021 WL 4034226, at *2 (E.D. Mich. Sept. 3, 2021) (same in § 1983 action); *Bowles v. Sabree*, 2022 WL 141666, at *9 (E.D. Mich. Jan. 14, 2022) (same).

Accordingly, Plaintiff's claim was tolled for 101 days from March 10, 2020, to June 20, 2020. Therefore, any disclosure of Plaintiffs' PRI between December 14, 2015 and July 30, 2016 is actionable in this case. *See supra* Section IV, Part A n. 4.

## CONCLUSION

For the foregoing reasons, the Motion should be denied in its entirety.

Dated: September 2, 2022        Respectfully Submitted,

           */s/ E. Powell Miller*
           E. Powell Miller (P39487)
           THE MILLER LAW FIRM, P.C.
           950 W. University Drive, Suite 300
           Rochester, MI 48307
           Tel: 248-841-2200
           epm@millerlawpc.com
           Sharon S. Almonrode (P33938)
           ssa@millerlawpc.com

Joseph I. Marchese
Philip L. Fraietta (P85228)
BURSOR & FISHER, P.A.
888 Seventh Avenue
New York, New York 10019
Tel: 646.837.7150
Fax: 212.989.9163
jmarchese@bursor.com
pfraietta@bursor.com

Frank S. Hedin
David W. Hall
HEDIN HALL LLP
1395 Brickell Avenue, Suite 1140
Miami, Florida 33131
Tel: 305.357.2107
Fax: 305.200.8801
fhedin@hedinhall.com
dhall@hedinhall.com

*Counsel for Plaintiff and the Putative Class*

## CERTIFICATE OF SERVICE

I hereby certify that on September 2, 2022, I electronically filed the foregoing documents using the Court's electronic filing system, which will notify all counsel of record authorized to receive such filings.

/s/ E. Powell Miller
E. Powell Miller (P39487)
**THE MILLER LAW FIRM, P.C.**
950 W. University Dr., Ste. 300
Rochester, MI 48307
Tel: (248) 841-2200
epm@millerlawpc.com